PUEBLO INTERNATIONAL, INC. y OTROS, demandantes y apelados, *v.* Héctor Rivera Cruz y otros, demandados y apelantes.

Número: CE-86-430     Resuelto: 20 de enero de 1989

*Rubén T. Nigaglioni* y *Eric R. Ronda Del Toro*, de *Ledesma, Palou & Miranda*, abogados de los apelados individuales; *Samuel T. Céspedes* y *Manuel A. Guzmán*, de *McConnell, Valdés, Kelley, Sifre, Griggs & Ruiz-Suria*, abogados de Pueblo International, Inc., apelados; *Rafael Ortiz Carrión, Procurador General*, abogado de los apelantes.

## RESOLUCIONES

A la moción de reconsideración presentada por la parte apelada, no ha lugar. Los Señores Jueces que participan en el recurso reiteran y ratifican sus respectivas posiciones en lo referente a la constitucionalidad o inconstitucionalidad de la Ley de Cierre, según las mismas quedaran plasmadas en la sentencia emitida el 23 de noviembre de 1988.

Se aclara, sin embargo, que el Tribunal entiende que los establecimientos comerciales operados por sus propios dueños, esposas o hijos están exentos de las disposiciones de la referida Ley de Cierre.

A la moción de solicitud de clarificación de los efectos de la sentencia emitida presentada por la Oficina del Procura-

dor General de Puerto Rico en representación de la parte apelante, no ha lugar por académica.

La parte apelada deberá atenerse a lo resuelto. Se instruye al Secretario General del Tribunal para que proceda de inmediato a la remisión del mandato en el caso de epígrafe.

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió voto concurrente. El Juez Presidente Señor Pons Núñez emitió voto explicativo en el cual disiente y al cual se une el Juez Asociado Señor Alonso Alonso. La Juez Asociada Señora Naveira de Rodón se inhibió.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

—O—

Voto concurrente del Juez Asociado Señor Negrón García.

## I

La Ley de Cierre, 33 L.P.R.A. secs. 2201–2203, es constitucional. Como expresamos en nuestra opinión concurrente de 23 de noviembre de 1988, la "opinión pública, como realidad inserta en el tejido social, es materia que usualmente corresponde canalizar y atender a la Asamblea Legislativa". *Pueblo Int'l, Inc. v. Srio. de Justicia*, 122 D.P.R. 703, 706 (1988).

Y más adelante añadimos:

[D]esde la psicodinámica judicial, estamos persuadidos de que el fenómeno histórico, cultural, económico, social, laboral y legal que resume las complejidades de la Ley de Cierre podemos expresarlo del siguiente modo: para el economista, un indicador en su hoja de ganancias y pérdidas; para ciertas grandes cadenas de supermercados y comercios, una rémora en su afán de acaparar el mercado; para algunos estudiantes empleados a tiempo parcial y transitorio, unas horas más de ingreso suplementario; para el pequeño e intermedio comer-

ciante, una protección contra el imperio capitalista; para el trabajador, un merecido descanso; para el consumidor, un estatuto obsoleto que afecta la conveniencia de un día adicional para comprar; para el sociólogo, la identidad colectiva; para el sacerdote o ministro, un día de oración; para la familia, una fuente de unidad; para el pueblo puertorriqueño, la preservación de un día común impregnado de aire y sabor diferente.

Al pasar este balance, nos percatamos de lo peligroso y superficial que resulta asumir una posición fundada exclusivamente en uno de esos intereses. Una conclusión sí es clara y aflora como verdad indiscutible: *aquellos empresarios y consumidores que se oponen a la Ley de Cierre y la tachan de inconstitucional y arcaica son los que regularmente no se verán precisados a renunciar su disfrute ni a trabajar los domingos y días feriados.*

La sabiduría, la valoración y el equilibrio de estos intereses en conflicto —ausente una lesión atendible en la dimensión constitucional— corresponde a los Poderes Legislativo y Ejecutivo. No compete enjuiciarlos al Poder Judicial, cuya lupa en esta compleja materia no tiene el diámetro suficiente para conciliar y canalizar el pluralismo de los sectores que nutren la opinión pública. Por la naturaleza socioeconómica y valores subyacentes de la Ley de Cierre, afortunadamente ha prevalecido otra vez su constitucionalidad. Otro curso decisorio hubiese tenido desoladoras consecuencias en nuestro cuerpo doctrinario constitucional; más aún, se hubiese erigido a costa del sufrimiento de los más débiles: *los trabajadores. Pueblo Int'l, Inc. v. Srio. de Justicia,* supra, págs. 748–749.

## II ·

Es materia susceptible de conocimiento judicial que fue Pueblo International, Inc. —una de las principales cadenas de supermercados del país— el que intencional y sistemáticamente comenzó a abrir sus establecimientos los domingos y días feriados en violación de la ley.

Nadie cuestiona seriamente que esa conducta y actividad fue generada por su afán de lucro, el progreso material económico y el consumerismo desmedido. A ultranza, Pueblo In-

ternational, Inc. quiso imponer sus intereses preeminentemente pecuniarios sobre los valores individuales y sociales encarnados en esta ley, a saber: promover la integración física del trabajador y la unidad del núcleo familiar; impedir que el proceso de descomposición familiar sea más acelerado; detener el deterioro de la calidad de vida; desalentar el consumerismo mimético desenfrenado; evitar ciertas prácticas monopolísticas y proteger al pequeño comerciante de la desventaja competitiva.

Insatisfecho con las enmiendas adoptadas en 1983 por la Asamblea Legislativa con miras a balancear la pluralidad de reclamos y a atemperar la Ley de Cierre a la realidad prevaleciente, Pueblo International, Inc. continuó con su exigencia de abrogación total. Al no lograrlo, en un claro menosprecio de la ley y en el ejercicio de todo su poderío económico, optó por abrir. Con ello inició un ciclo de aperturas. Otros establecimientos se vieron forzados a imitarlo para contrarrestar la ventaja competitiva lograda por Pueblo International, Inc.

Ciertamente todos estos antecedentes fácticos justifican plenamente la acción del Departamento de Justicia en su contra. Al seguir Pueblo International, Inc. ese curso de acción —que la prueba refleja le rindió una mejoría en sus ganancias— lo hizo conscientemente. Inició una campaña pública y masiva en contra de la Ley de Cierre y, finalmente, acudió a los tribunales. *Ante esta situación, rehusamos asumir un rol de paternalismo judicial a su favor.*

### III

En el plano teórico, hemos de descartar toda *especulación* en cuanto a la aplicabilidad futura de la Ley de Cierre a los pequeños comerciantes y su potencial aplicación selectiva y discriminatoria. "En materia de interpretación constitucional carecemos del encanto de la magia y del hechizo esférico de la consabida bola de cristal." *Pueblo Int'l, Inc. v. Srio. de Justicia*, supra, pág. 743, opinión concurrente del

Juez Asociado Señor Negrón García. Igual que el filósofo Voltaire, creemos que el tiempo es la espada de la justicia y pone cada cosa en su lugar. Por el momento, basta señalar que el Estado no viene obligado —por razones obvias de limitaciones de recursos— a perseguir y denunciar a todo infractor de una ley. Si sostuviéramos semejante propuesta —por mencionar sólo algunas— ¿no sería entonces inconstitucional la Ley de Vehículos y Tránsito de Puerto Rico, la Ley de la Bolita, la Ley de Sustancias Controladas de Puerto Rico? "En ausencia de prueba de un patrón de evidente discrimen y abuso patente de discreción, una persona o entidad no puede justificar su violación de la ley sobre la base de que no se ha perseguido a otros infractores." *A.R.P.E. v. Chang Louk*, 113 D.P.R. 295, 297 (1982).

En la dimensión constitucional, dista mucho este caso de proyectar un discrimen selectivo comparable al que hubo en *Hernández Colón v. Srio. de Hacienda*, 115 D.P.R. 145, 162–167 (1984), a saber, la imposición arbitraria de unas deficiencias contributivas al adversario político principal, candidato a la gobernación poco antes de las elecciones. Menos, al detectado en *Pueblo v. Arandes de Celis*, 120 D.P.R. 530 (1988), compatible con la persecución y denuncias criminales formuladas sistemáticamente contra el movimiento independentista. Rechazamos situar en la misma escala jerárquica estos dos (2) últimos valores constitucionales. No son equiparables con el simple afán de lucro económico que anima a Pueblo International, Inc.

Ciertamente, para un lego, la técnica de distinguir o contraponer actividades permitidas a las prohibidas por la Ley de Cierre es impresionante. Empero, para el jurista la misma no es válida, pues se abstrae del postulado elemental de que "[n]uestra función es interpretar la ley y no juzgar su bondad o sabiduría". *Famania v. Corp. Azucarera de P.R.*, 113 D.P.R. 654, 657–658 (1982). No podemos olvidar que la "sabiduría de una ley, o su obsolescencia o impopularidad

social no constituyen fundamentos válidos en apoyo de su inconstitucionalidad por la Rama Judicial". (Escolio omitido.) *Pueblo Int'l, Inc. v. Srio. de Justicia,* 117 D.P.R. 754, 756 (1986), voto disidente del Juez Asociado Señor Negrón García. Así pues, no es función judicial "condonar" las limitaciones en las oportunidades de empleo resultantes de esta ley, como tampoco sus variantes en torno a actividades en negocios o lugares con fines recreativos, vendan o no bebidas alcohólicas. De lo contrario, nos corremos el riesgo de permutar el *estrado apelativo* por un *pupitre legislativo.*

## IV

Aclarados estos extremos, notamos que *es erróneo* sostener que "la excepción dispuesta en la ley referente a los establecimientos operados por sus propios dueños, cónyuges e hijos . . . *sólo cubre algunas horas".* (Énfasis en el original.) *Pueblo Int'l, Inc. v. Srio. de Justicia,* 122 D.P.R. 703, 811 (1988), opinión disidente del Juez Presidente Señor Pons Núñez; Voto explicativo del Juez Presidente Señor Pons Núñez, págs. 196–197. Esa premisa equivocada lo lleva incluso a concluir que "esa excepción no cubre los domingos y sí sólo algunas horas en otros días de la semana". (Énfasis suprimido.) Voto explicativo del Juez Presidente Señor Pons Núñez, págs. 196–197. *Ni siquiera Pueblo International, Inc. y los otros apelados sostienen esa proposición. Por el contrario, aceptan que están exentos.* Alegato, págs. 5 y 8.

El error aparentemente es producto de una interpretación forzada e incompleta de la ley, que ignora totalmente su historial legislativo. Veamos.

El legajo de la Asamblea Legislativa es diáfanamente claro. La excepción referente a los establecimientos operados por sus dueños, esposa e hijos fue incorporada originalmente mediante la Ley Núm. 113 de 27 de junio de 1964 (33 L.P.R.A. sec. 2201(a)). En lo pertinente, señala:

Para enmendar el inciso (a) del Artículo 553 del Código Penal, conocido como "Ley de Cierre de Establecimientos Comerciales".

*Decrétase por la Asamblea Legislativa de Puerto Rico:*

Sección 1.—Se enmienda el inciso (a) del Artículo 553 del Código Penal para que se lea como sigue:

"Artículo 553.—(a) Los establecimientos comerciales permanecerán cerrados al público, sin que pueda realizarse en los mismos ninguna clase de trabajo después de una hora de cerrados, durante los días y horas que se especifican a continuación:

"1. Durante todo el día: los domingos, excepto cuando fueren domingos los días 24 y 31 de diciembre y 5 de enero; el primer lunes de septiembre (Día del Trabajo), el 4 y 25 de julio, 25 de diciembre, los días de elecciones generales en Puerto Rico y el Viernes Santo.

"2. Todos los viernes desde las 9:00 P.M.; todos los sábados y demás días laborables desde las 6:00 P.M.; y los días 24 y 31 de diciembre y 5 de enero desde las 10:00 P.M. *Los establecimientos operados por sus propios dueños, esposa o hijos, quedan exentos de las disposiciones del Artículo 553, inciso (a)*." (Énfasis suplido, en el original y escolio omitido.) 1964 Leyes de Puerto Rico 359.

Una mirada retrospectiva al recinto legislativo nos permite observar que el propósito original de esta excepción — según el P. de la C. 509— fue sólo autorizar la apertura los viernes hasta las 9:00 P.M. de todos los comercios y, además, "permitirle a los dueños de aquellos establecimientos comerciales operados por ellos y sus familiares en seleccionar cuál día, entre el sábado y el viernes de cada semana, desean permanecer abiertos hasta las 9:00 de la noche". Informe de las Comisiones de lo Jurídico y de Comercio e Industria de la Cámara de Representantes, 18 Diario de Sesiones de la Asamblea Legislativa 1166 (1964).

Sin embargo, *esta idea inicial fue ampliada.* Se acogió una enmienda propuesta del legislador señor Ortiz Noriega, *y se les eximió de la ley.* Al efecto, el señor Torres Gómez,

presidente de la Comisión de Comercio e Industria, consignó:

> ... No tenemos objeción, porque el efecto de la enmienda *es sacar de la prohibición de la ley de cierre actual de los establecimientos que sean operados por sus dueños o familiares* que generalmente son establecimientos pequeños en las zonas montañosas y rurales y semiurbanas; y en ese mismo sentido ya esta Cámara aprobó un proyecto el año pasado que está pendiente de acción del Senado; de modo que no hay objeción a la enmienda. (Énfasis suplido.) Diario de Sesiones, *supra*.

Y más adelante, frente a las dudas de otro representante, se suscitó el diálogo siguiente:

> *Sr. Viera Morales*: ¿El alcance de la enmienda que se acaba de aprobar *permitiría que un colmado de barrio pueda permanecer abierto todo el domingo?*
> *Sr. Presidente*: ¿Se refiere a la enmienda propuesta por el compañero Ortiz Noriega?
> *Sr. Torres Gómez*: Sí, *todo el tiempo*, siempre que sea operado por su dueño o familiar; o sea, que no tenga empleados. (Énfasis suplido.) Diario de Sesiones, *supra*.

Lo expuesto quedó avalado en el lenguaje finalmente aprobado. También explica por qué esta excepción quedó insertada en este inciso (a) y no en el inciso (b), que agrupa sistemáticamente el resto de las excepciones. Si desconocemos este historial legislativo, nos exponemos a la confusión. Según hemos visto, de la idea básica de concederles a estos establecimientos la opción de permanecer abiertos hasta las 9:00 P.M., viernes o sábados, se dispuso quedaran "exentos de las disposiciones del Artículo 553, inciso (a)". Indiscutiblemente el inciso (a) es el único que contiene la prohibición. En buena hermenéutica no vemos, pues, forma alguna en qué fundar la tesis de que "esta histórica excepción sólo cubre algunas horas ...." *Pueblo Int'l, Inc. v. Srio. de Justicia*, 122 D.P.R. 703, 811 (1988), opinión disidente del Juez Presidente Señor Pons Núñez. Por el contrario, su his-

torial y texto confirman que estos establecimientos quedaron excluidos de la Ley de Cierre.

Este enfoque permaneció inalterado en las últimas enmiendas. A tal efecto, la Ley Núm. 100 de 4 de junio de 1983 dispuso:

> Para enmendar el *párrafo introductorio* y el *Apartado (2) del inciso (a)*, se adiciona un Apartado (14) del inciso (b), se adiciona un nuevo inciso (c) y se enmienda y redesigna el inciso (c) como inciso (d) del Artículo 553 del Código Penal de Puerto Rico, edición de 1937, según enmendado y para disponer penalidades.
>
> *Decrétase por la Asamblea Legislativa de Puerto Rico:*
>
> Sección 1.—*Se enmienda el párrafo introductorio y el Apartado (2) del inciso (a)*, se adiciona un Apartado (14) del inciso (b), se adiciona un nuevo inciso (c) y se enmienda y redesigna el inciso (c) como inciso (d) del Artículo 553 del Código Penal de Puerto Rico, edición de 1937, según enmendado, para que se lea como sigue:
>
> Artículo 553.—
>
> (a) Los establecimientos comerciales permanecerán cerrados al público, sin que pueda realizarse en los mismos ninguna clase de trabajo después de dos horas de cerrados, durante los días que se especifican a continuación:
>
> (1) . . . . . . . . . . . . . . . . . . . . . . .
>
> (2) Todos los días laborables de lunes a sábado desde las 9:00 P.M.; y los días 24 y 31 de diciembre y 5 de enero desde las 10:00 P.M. *Los establecimientos operados por sus propios dueños, cónyuges o hijos, quedan exentos de las disposiciones de este inciso.* (Énfasis suplido, en el original y escolio omitido.) 1983 Leyes de Puerto Rico 287–288.

Este lenguaje también es transparente. Para fines de clasificar y dividir materia correlacionada de lo general a lo *particular*, la Asamblea Legislativa simplemente utilizó el método de identificar la serie según *párrafos, incisos y apartados.* Así el lenguaje particular, *in fine*, del Apartado (2) —expositivo de que los establecimientos familiares "quedan exentos de las disposiciones de este inciso"— no es otra

cosa que una referencia *directa* a la prohibición general de cierre, contenida precisamente en el inciso (a).

Esta clara excepción en la Ley de Cierre está en armonía con la intención legislativa y con el espíritu de uno de los *múltiples motivos* que animaron su redacción. Como señalamos originalmente:

> Sus horizontes son más espaciosos. En época más reciente, en un incidente de este mismo caso —*Pueblo Int'l, Inc. v. Srio. de Justicia*, 117 D.P.R. 754, 758 (1986)[, voto disidente del Juez Asociado Señor Negrón García]— tuvimos la oportunidad de comenzar a definir y cualificar esta premisa. Allí sostuvimos que la Ley de Cierre "está cimentada en promover, hasta lo posible, la existencia del domingo como *determinado* día de descanso, y por ende, la integridad física del trabajador y *la unidad del núcleo familiar*". (Énfasis suplido.) Es menester, pues, ampliar esta apreciación.
>
> La designación del *domingo*, como día *colectivo* de descanso es una conquista social de inmenso valor. Responde al concepto legislativo de que el ser humano —física, mental y espiritualmente— es acreedor a un merecido paréntesis de sosiego durante la jornada regular semanal. Sin límites, tendríamos que vivir una jornada diferente, en última instancia, a expensas de las necesidades y voluntad patronal. El calendario gregoriano usado por tradición —*Escalera v. Andino*, 76 D.P.R. 268, 271 (1954)— se quedaría en blanco, *sus días innominados*, reducido únicamente a la simple aritmética de contar los espacios de tiempo en días, semanas y meses. Cada persona estaría sujeta a un distinto ritmo semanal que difícilmente contribuiría a apartarse del trajín rutinario.
>
> La Ley de Cierre —quién lo duda— ha contribuido por ochenta y seis (86) años a esa conquista. Por ella el *domingo* se impregnó en la sociedad con ese sabor particular a vida humana, familiar, religiosa y deportiva. Adquirió y confirmó la urgencia de darle un "¡Alto!" a nuestra rutina sofocante y fatigosa. *Acopló al núcleo familiar el calendario escolar de cientos de miles de niños y jóvenes*. En otras palabras —en virtud de toda una serie de actividades privadas y gubernamentales de lunes a viernes o sábado— en la acepción popular y generalizada, el *domingo* se invistió de una connotación re-

frescante que apunta hacia unas horas —las únicas— que hacen viable que la mayoría de los puertorriqueños, individual y colectivamente, pueda disponer de un descanso necesario después del cumplimiento obligatorio con su trabajo. La iglesia, la playa, el maratón, la visita familiar, la bicicletada, sencillamente la conversación reposada en el hogar o el disfrute de la música o la sintonía de la actividad deportiva favorita ocupan gozosamente nuestras horas y desocupan nuestro aliento para emprender al día siguiente el forzoso programa de nuestros compromisos.

Desde la panorámica laboral y sociológica, la ley es justa y necesaria. Atempera el desasosiego agobiante en que cada día más se ve inmerso el hombre de nuestro tiempo. Hoy más que nunca cumple con la necesidad humana de mitigar el ajetreo y el estruendo, y devolverle a la persona un poco del reposo que su dignidad reclama. (Énfasis suplido, en el original y escolio omitido.) *Pueblo Int'l, Inc. v. Srio. de Justicia,* 122 D.P.R. 703, 714–716 (1988), opinión concurrente del Juez Asociado Señor Negrón García.

Ciertamente la excepción que nos ocupa en la Ley de Cierre protege al núcleo familiar. A fin de cuentas, la decisión de abrir o no el domingo y horas proscritas es de naturaleza *voluntaria.* La excepción está dirigida a la empresa familiar y fomenta no sólo la mejoría económica de ese núcleo —por esfuerzo mutuo— sino que también la actividad per se promueve su unidad. ¿Puede entonces establecerse válidamente una analogía de esos valores familiares —así protegidos— con los intereses puramente económicos de Pueblo International, Inc. o establecimientos similares? Lógicamente, en este extremo, el ámbito conceptual y esquema operacional, valores e intereses no son comparables. El elemento clave es la libre volición.

Sin la Ley de Cierre —o la existencia de otros mecanismos alternos que restrinjan la voluntad patronal de imponer a los trabajadores la obligación de laborar los domingos— ¿cabe sostenerse que la apertura dominical adelanta la unidad familiar?

*Son los empresarios los que deciden no sólo quiénes traba-
jan, sino a qué horas lo hacen y por cuánto dinero.* Controlan,
por lo tanto, las circunstancias de la vida en familia. En mu-
chos casos los cónyuges enfrentan largas jornadas de trabajo,
bajo condiciones de alta competencia, en labores monótonas y
repetitivas que resultan muy tediosas. Naturalmente esto re-
percute en el hogar, que recoge los despojos de una pareja que
llega cansada e irritada y que ha estado ausente durante
largas horas. Esas circunstancias no son las más propicias
para promover una relación conyugal sana y gratificadora.
(Énfasis suplido.) M. Muñoz Vázquez y E. Fernández Bauzó,
*El divorcio en la sociedad puertorriqueña*, Río Piedras, Eds.
Huracán, 1988, pág. 29.

El análisis aislado de cada una de las excepciones de la
Ley de Cierre es necesario. Sin embargo, ese método resulta
trunco si en determinados momentos no es integral. Cuando
examinamos un estatuto tan complejo, como es la Ley de
Cierre, lejos de compartimentar debemos adoptar un trata-
miento dialéctico que permita auscultar las interrelaciones
de sus componentes y comprender la naturaleza y razones de
sus aparentes contradicciones. Sólo desde esa perspectiva
global y amplia podremos separar lo insignificante de lo de-
terminante, lo insulso de lo sustancial.

Según esta perspectiva, en términos porcentuales, la ra-
zonabilidad y racionalidad de esta excepción no merman por
razón del restante núcleo familiar todavía protegido. Repe-
timos:

. . . [M]erece especial atención el énfasis que incluye el foro
de instancia en relación con la magnitud del sector no cubierto
por la ley, utilizado como fundamento primario para su deter-
minación final. Nos referimos a que sólo el 12.5% de la fuerza
laboral está sujeta a la prohibición, lo cual a su juicio es in-
constitucionalmente irrazonable. Como argumento, este por
ciento representa una estadística fría que no reproduce fiel-
mente la situación e inintencionalmente enmascara la reali-
dad. El universo numérico es más amplio. Si con ojo perspicaz
la examinamos, inmediatamente descubrimos que el 12.5% ex-

cluye los 263,000 trabajadores del sector público. Esta cifra actualmente representa un segmento sustancial: el 33.1% de la fuerza trabajadora del país. Aunque carecemos del desglose exacto de cuántos de estos empleados públicos no trabajan los fines de semana, tomamos conocimiento judicial de que la mayoría no lo hace. La regla general es que los empleados del gobierno estatal, los municipales, los de las corporaciones públicas y los del gobierno federal disfrutan del domingo como día de descanso, salvo aquellos que se desempeñan en servicios esenciales o de emergencia. Asimismo es de conocimiento general que muchos de los trabajadores de los establecimientos comerciales e industriales a los que no cobija la ley no trabajan durante los días y las horas reglamentadas por el estatuto. Si a estas cifras sumamos los 179,000 desempleados que desafortunadamente hay en el país —y los 2,281,000 seres que no forman parte de la fuerza trabajadora— con meridiana claridad podemos concluir que *la inmensa mayoría de los puertorriqueños tiene disponible el domingo para disfrutarlo de acuerdo con sus intereses y preferencias, lo cual es congruente con los propósitos primarios y secundarios de la ley, tales como descanso, unidad familiar, etc.* (Énfasis en el original y escolios omitidos.) *Pueblo Int'l, Inc. v. Srio. de Justicia*, 122 D.P.R. 703, 736–737 (1988), opinión concurrente del Juez Asociado Señor Negrón García.

*No puede, pues, existir duda alguna. La Ley de Cierre no aplica a los establecimientos operados por sus propios dueños, cónyuges e hijos. Sin infringir la ley, éstos pueden voluntariamente abrir los domingos. Así lo aceptan todas las partes.* Ello está en armonía con uno de los diversos propósitos de la ley: *unidad familiar.*

## V

Finalmente, en cuanto a la regla especial del empate, aplicable al caso de autos por razón del requisito de mayoría absoluta —Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, *in fine*— se aduce que "no es éste el momento más apropiado para reexaminar la misma. El planteamiento tiene méritos

que entendemos este Tribunal debe examinar en una ocasión futura más oportuna". Voto explicativo del Juez Presidente Señor Pons Núñez, pág. 200.

Nos inquieta este aserto. En *primer* lugar, Pueblo International, Inc. y los otros apelados así lo solicitan. Y *segundo*, todos estamos contestes en que se trata de un asunto revestido de interés público e importancia.

En estas circunstancias, honestamente creemos que si existiera alguna duda en una mayoría de los miembros del Tribunal sobre la vigencia de la regla del empate, deberíamos enfrentarnos al planteamiento de Pueblo International, Inc. de que la revoquemos. ¿Por qué no hacerlo ahora y posponerlo para una ocasión futura? ¿Qué caso será el apropiado y oportuno? Difícilmente podemos concebir uno que mejor lo amerite. No sólo los aquí litigantes son acreedores a ese pronunciamiento, sino la adecuada ordenación de nuestra labor institucional al nivel constitucional. *La estabilidad y valía del stares decisis, así como la seriedad de nuestros dictámenes, lo justifican.*

Al respecto, no albergamos reserva alguna en cuanto a la solidez de la norma de *Pueblo v. Torres Lozada,* 106 D.P.R. 588 (1977), y seguida en *P.I.P. v. E.L.A.,* 109 D.P.R. 685 (1980). Aun bajo el prisma constitucional, no podemos acceder al pedido de Pueblo International, Inc. de reconsiderarla. Su vigencia es la única congruente con el espíritu que prevaleció en la Asamblea Constituyente respecto a la presunción de constitucionalidad.

Aparte de ello, en la dimensión deontológica subsisten válidos fundamentos. En última instancia, para el escrupuloso y auténtico jurisprudente, ello atentaría contra el derecho "más sagrado y de mayor carga valorativa: la libertad de conciencia que es la voz espiritual más íntima del ser humano". *Noriega v. Gobernador,* 122 D.P.R. 650, 695 (1988), opinión de conformidad del Juez Asociado Señor Negrón García, de 21 de noviembre de 1988. ¡Es imposible visualizar

al juez simplemente como un *homo juridicus*! El buen juez "[s]iempre sabrá prestar oídos, en última instancia, a la voz de la conciencia, verdadera pauta de moralidad difícilmente falible cuando la inteligencia está ilustrada por la ciencia y la voluntad disciplinada por la moral. Todos sabemos de las constantes y moduladas inflexiones de esta voz insobornable, fértil consejera, desinteresada amiga, a veces suavemente tranquilizadora, en otras insistentemente admonitiva". (Escolios omitidos.) F. Soto Nieto, *Compromiso de Justicia*, Madrid, Ed. Montecorvo, 1977, pág. 22. ¿Cómo pedirle mancillar su propia estimación, prestigio y dignidad vocacional? La libertad de conciencia espiritual es *el ALFA y el OMEGA* de una verdadera independencia judicial.

En definitiva, frente a la inhibición moral —fundada en unos lazos inquebrantables que alcanzan el segundo grado de consanguinidad— no cabe invocar regla constitucional de necesidad. *Noriega Rodríguez v. Gobernador*, 120 D.P.R. 267 (1988).

—O—

Voto explicativo emitido por el Juez Presidente Señor Pons Núñez, al cual se une el Juez Asociado Señor Alonso Alonso.

I

El Secretario de Justicia ha presentado una moción de solicitud de clarificación de los efectos de la sentencia emitida el 23 de noviembre de 1988. Aun cuando la misma carece de méritos, pues no existe razón alguna para que adoptemos en este caso una regla distinta a la usual en cuanto a la vigencia de nuestras sentencias, por traer ella ante nos el tema subyacente de la implantación de la Ley de Cierre, nos parece apropiado señalar unas consideraciones adicionales en torno a ello. Las mismas no son especulaciones ni el producto

de clarividencia, sino las inferencias razonables que se derivan de las actuaciones pasadas del Estado que constan en autos.

En las intervenciones que en torno al asunto ha realizado el Estado se da la sensación de que la Ley de Cierre se concibe como sólo aplicable, en cuanto al domingo se refiere, a los grandes comercios. *No se plantea el efecto de la misma sobre los pequeños comercios que, bajo los claros términos de este estatuto, también tendrían que cerrar los domingos.* Nótese que cuando el Estado mobilizó sus fuerzas coactivas el 9 de marzo de 1986 lo hizo sólo en cuanto a Pueblo International, Inc. (*Pueblo Int'l, Inc. v. Srio. de Justicia*, 117 D.P.R. 230, 266 (1986), voto concurrente y disidente). Adviértase, además, que la notificación del Departamento de Justicia, a los efectos de requerir cumplimiento con la ley —que originó este pleito— se le entregó únicamente a Pueblo Supermarkets y a Plaza Gigante.

El Estado viene obligado a velar por que todos, grandes y pequeños, cierren los domingos. El estatuto no establece excepción alguna en favor de un denominado "pequeño comerciante", como tampoco la establece a favor de los grandes comerciantes. En la medida que no lo haga estaría implantando la ley selectiva y discriminatoriamente. Dicho de otro modo: los domingos estarán obligados a cerrar no sólo los supercolmados Pueblo, sino hasta el más pequeño y humilde colmadito en la ciudad y en el barrio más remoto de Puerto Rico; no sólo tiene que cerrar la gran ferretería, sino también la pequeñita que resuelve los apuros de la persona que dedica algunos domingos a reparar su hogar; no sólo tiene que cerrar la gran tienda por departamentos, sino también la pequeña mercería.

El derecho a la igual protección de las leyes no se viola únicamente cuando de su propia faz determinada ley establece clasificaciones constitucionalmente impermisibles entre distintos ciudadanos, sino también cuando a pesar de su

validez intrínseca ésta se aplica de manera selectiva injustificadamente. Hace ya tiempo que en el constitucionalismo norteamericano se adoptó el referido principio como parte de la igual protección de las leyes.

En *Sunday Lake Iron Co. v. Wakefield*, 247 U.S. 350, 352 (1918), expresó el Tribunal Supremo federal que "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents". Véanse, además: *Truax v. Corrigan*, 257 U.S. 312 (1921); *Oyler v. Boles*, 368 U.S. 448 (1962); *Carter v. Jury Commission*, 396 U.S. 320 (1970); *Wayte v. United States*, 470 U.S. 598 (1985). En *Pueblo v. Lausell Hernández*, 121 D.P.R. 823, 854 (1988), se resume esta doctrina en los términos siguientes:

> . . . es de todos conocido que aun ante estatutos como el que ocupa nuestra atención [neutrales y constitucionales de su faz], puede surgir un problema constitucional si el mismo es aplicado en forma arbitraria, selectiva y discriminatoria a una persona o a un grupo de personas. Ello, como es sabido, constituye una violación del derecho a la igual protección de las leyes.
>
> No se trata de que el Gobierno de Puerto Rico no pueda acusar criminalmente a sus ciudadanos . . . . Se trata de que no lo puede hacer en forma selectiva y discriminatoria . . . . (Énfasis suprimido y cita omitida.)

Es este un caso en que es particularmente fácil constatar la aplicación selectiva y discriminatoria del estatuto. Se trata de un crimen legislado donde los actos constitutivos del delito se llevan a cabo ostensiblemente, en un sólo día de la semana, a la luz del día y a la vista de toda la ciudadanía. No se trata de una violación de ley o del crimen usual cometido en la clandestinidad o secretividad, en donde establecer la violación o identificar al violador requiere complejas y difí-

ciles investigaciones. Las leyes no pueden utilizarse para perseguir personas por sus creencias políticas, por su color o raza, por la posición que ocupan en la sociedad ni por pequeños o grandes que sean. No se trata de favorecer al grande sobre el pequeño, pues el resultado sería el mismo si la situación fuere a la inversa. En la implantación de las leyes el Estado no puede partir de un fundamento selectivo o arbitrario.

La posición de que la Ley de Cierre no obliga a cerrar los domingos a los pequeños negocios es errada en tanto se fundamenta en la excepción prevista en el Art. 553(a)(2) de la Ley de Cierre[1] referente a los establecimientos operados por sus propios dueños, cónyuges e hijos. Ya hemos expresado que entendemos que necesariamente no existe equivalencia entre negocio pequeño y dicha excepción. Sin embargo, cabe señalar que de todos modos a nuestro juicio la interpretación más razonable es que *esa excepción no cubre los domingos y sí sólo algunas horas en otros días de la*

---

[1] Esta parte del estatuto dispone desde 1971 lo siguiente:

"(a) Los establecimientos comerciales permanecerán cerrados al público, sin que pueda realizarse en los mismos ninguna clase de trabajo después de una hora de cerrados, durante los días y horas que se especifican a continuación:

"(1) Durante todo el día: los domingos, excepto cuando fueren domingos los días 24 y 31 de diciembre y 5 de enero; el primer lunes de septiembre (Día de Trabajo), el primero y seis de enero, el 4 y 25 de julio, 25 de diciembre, los días de elecciones generales en Puerto Rico, el Día de Acción de Gracias y el Viernes Santo.

"(2) Todos los viernes desde las 9:00 P.M.; todos los sábados y demás días laborables desde las 6:00 P.M.; y los días 24 y 31 de diciembre y 5 de enero desde las 10:00 P.M. Los establecimientos operados por sus propios dueños, esposa o hijos, quedan exentos de las disposiciones de este inciso." 33 L.P.R.A. sec. 2201(a)(1) y (2).

La interpretación de que la excepción en cuestión cubre también los domingos se fundamenta en que la frase "este inciso", que aparece al final de la oración que crea esa excepción en el párrafo (a)(2), se refiere a toda la disposición 553(a) y no sólo a la 553(a)(2), que es donde aparece transcrita la excepción. Como se puede observar, el Art. 553(a) dispone el cierre tanto dominical como en otras horas durante la semana, mientras que el (a)(2) se refiere únicamente a algunas horas. Nosotros entendemos que es sólo a la disposición (a)(2) que se aplica la excepción.

*semana.* Si aceptamos, *arguyendo,* la plausibilidad de la exégesis que se propone en cuanto al párrafo (a) del Art. 553, *tenemos que concluir que dicha interpretación se convierte en un argumento circular que contradice la premisa de constitucionalidad de la ley* que descansa en su alegado propósito de convertir el domingo en "'día colectivo de descanso'" que propicia la unidad familiar "'[al] darle un "¡Alto!" a nuestra rutina sofocante y fatigosa'". (Énfasis suprimido.) Voto concurrente del Juez Asociado Señor Negrón García, pág. 188. *Adviértase que la interpretación propuesta tiene la consecuencia de señalar que el descanso perseguido por la ley no cubre la unidad familiar más básica (dueños-cónyuges e hijos) cuando éstos operan el establecimiento comercial los domingos.* ¿A qué familias, entonces, va dirigido el estatuto? Si no tiene el propósito de proteger esos valores para las familias que laboran en todos los establecimientos exceptuados de las disposiciones de la ley (alrededor del 87% de la fuerza trabajadora) ni para las unidades familiares que operan su propio negocio, ¿a quiénes es que pretende proteger la ley y por qué esa protección es necesaria para esos pocos protegidos por el estatuto y no para todos los otros exceptuados? ¿En qué consiste la razonabilidad o racionalidad de la protección a ese reducido grupo de familias cuando la propia ley no protege las familias de más del 87% de la fuerza trabajadora?

Con respecto al argumento que se adelanta sobre la necesidad de proteger legislativamente la libertad del empleado a trabajar o no los domingos, basta con señalar que tal protección no ha sido considerada necesaria para la gran mayoría de la fuerza laboral del país que se encuentra excluida de las disposiciones de la ley en cuestión. No se justifica un trato distinto para los empleados cubiertos aún por dicho estatuto.

La interpretación de que la exclusión contenida en el Art. 553(a)(2) de la Ley Núm. 113 de 27 de junio de 1964 (33

L.P.R.A. sec. 2201(a)(2)) continúa vigente tal como entonces concebida en dicha ley, no explica el porqué *se eliminó en 1971* (Ley Núm. 83 de 24 de junio de 1971) la referencia específica al "Artículo 553, inciso (a)" cuando se retiene la exclusión referente a los establecimientos operados por sus propios dueños, cónyuges o hijos en la disposición del Art. 553(a)(2). Tampoco explica satisfactoriamente el porqué, si la intención fue que la exclusión cubriera todo lo cubierto en el Art. 553(a) en 1971, al eliminarse la referencia al "Artículo 553, inciso (a)" no se adicionó esa exclusión en el Art. 553(b) que es el que agrupa sistemáticamente las excepciones. En fin, sostenemos que no procede urgar para hallar una intención legislativa que permita adoptar una interpretación de un estatuto que contradice la razón que sirve de fundamento a su constitucionalidad. En buena hermenéutica, ambas no pueden coexistir. Si la premisa constitucional es correcta, la interpretación al estatuto debe armonizar con la premisa; si lo correcto es la interpretación del estatuto, entonces resulta que la premisa que le sirve de sostén constitucional es incorrecta. La interpretación que hacemos la requiere la premisa que se adelanta para sostener la constitucionalidad del estatuto. Al interpretar la ley, debemos considerar su *razón y su espíritu, o la causa o motivos* que indujeron a su aprobación. Art. 19 del Código Civil, 31 L.P.R.A. sec. 19. Resultaría más plausible y persuasiva la interpretación propuesta si no se apuntalara la constitucionalidad del estatuto en el descanso común de la familia.

## II

También Pueblo International, Inc. ha vuelto a recurrir ante nos en este caso. En esta ocasión con una moción de reconsideración donde reclama otra vez que se decrete la inconstitucionalidad de la Ley de Cierre y nos pide que revoquemos la interpretación que hicimos en *P.I.P. v. E.L.A.*, 109 D.P.R. 685 (1980), sobre el efecto de un empate en nuestra

votación al revisar un decreto de un tribunal de instancia que declara inconstitucional un estatuto.

En cuanto al reclamo de inconstitucionalidad, creemos que el Tribunal debe reconsiderar y decretar la inconstitucionalidad de la Ley de Cierre. Como bien se señala en la Moción de Reconsideración de 8 de diciembre de 1988, pág. 8, la ley que aquí nos ocupa "por contradecir el derecho al empleo y no constituir un mecanismo que racionalmente adelante el descanso para los trabajadores puertorriqueños (por existir otras leyes efectivas de aplicación uniforme a tales propósitos), no puede subsistir" constitucionalmente. Nos resulta imposible condonar que se prive de oportunidad de empleo en domingo a un sector de la fuerza trabajadora cuando la propia ley que así los priva permite trabajar el domingo en: (a) tiendas de expendio de bebidas alcohólicas, pero no en tiendas de venta de provisiones comestibles; (b) en establecimientos de juegos de azar (tales como casinos, hipódromos y galleras), pero no en tiendas de ropa o ferretería; (c) en cinematógrafos, pero no en "video clubs", y (d) en una zona turística, pero no en una zona rural o en un pequeño pueblo con un nivel bajo de ingresos. Una ley de naturaleza penal que —como consecuencia de sus inconsistencias y excepciones— propende a facilitar el empleo en la venta de bebidas alcohólicas sobre provisiones comestibles, en el juego de azar sobre la venta de vestimenta o artículos de ferretería y en el cinematógrafo sobre comercios que faciliten el disfrute en el hogar de una película, que permite el empleo en zonas turísticas para que algunas personas —en función de sus mayores recursos financieros— puedan acudir a esa zona a comprar provisiones comestibles, ropa y artículos de ferretería, y que en efecto le niega esa oportunidad de empleo en zonas a las que pueden acudir los menos afortunados económicamente, carece de validez constitucional.

Las exclusiones que contiene la Ley de Cierre favorecen comercios más grandes y poderosos que los de los recu-

rridos, los cuales emplean mayor número de trabajadores y se dedican por lucro y afán de progreso material a actividades que propician el consumismo y, en algunos casos, otras actividades de cuestionable valor social. Por ejemplo, en cuanto al consumismo, ese es el caso de los bancos, los establecimientos comerciales en las zonas turísticas, los hoteles, los aeropuertos y los establecimientos comerciales que por la naturaleza de su actividad necesitan mantener sistemas de operación continua; en cuanto a otras actividades, destacamos el hipódromo, los casinos, los salones de billar, las galleras y los establecimientos donde se venden bebidas alcohólicas. Rechazamos la visión que encuentra execrable la actividad de expendio de comestibles cuando la lleva a cabo Pueblo International, Inc. mientras tolera las actividades que se le permiten a este otro sector más poderoso económicamente y que afecta una proporción mucho mayor de nuestra población.

## III

En cuanto al planteamiento referente a la revocación de la norma establecida en *P.I.P. v. E.L.A.*, supra, nos parece que no es éste el momento más apropiado para reexaminar la misma. El planteamiento tiene méritos que entendemos este Tribunal debe examinar en una ocasión futura más oportuna. Por su importancia, el asunto no debe ser objeto de dictamen ad hoc en ocasión de que el Tribunal se encuentra dividido. Debe ser objeto de *reglamentación en ocasión en que puedan participar todos los Jueces* y no se encuentren subyacentes otras controversias sobre cuestiones sustantivas que dividan al Tribunal.

En resumen, sostenemos: (*a*) que el Tribunal debe reconsiderar su Sentencia de 23 de noviembre de 1988 y decretar la inconstitucionalidad de la Ley de Cierre; (*b*) que no existe razón para variar la regla en cuanto a la vigencia de nuestras sentencias; (*c*) que implantar la ley los domingos sólo en

cuanto a comercios grandes o que tengan empleados que no sean el dueño, sus cónyuges e hijos acarrea problemas de selectividad y arbitrariedad en su implantación que vulneran el principio constitucional de la igual protección de las leyes, y (*d*) que no es esta ocasión oportuna para reexaminar la norma establecida en *P.I.P. v. E.L.A.*, supra.

Por todo lo anteriormente expuesto, proveemos no ha lugar a la moción de solicitud de clarificación de los efectos de la sentencia y, por los fundamentos vertidos en nuestra opinión de 23 de noviembre de 1988, entendemos que este Tribunal debe reconsiderar su Sentencia de 23 de noviembre de 1988.

—O—

## RESOLUCIÓN

San Juan, Puerto Rico, a 27 de enero de 1989

El 20 de enero de 1989, por estar igualmente dividido el Tribunal, dictamos no ha lugar a la primera moción de reconsideración presentada por los demandantes apelados Pueblo International, Inc. *et al.*

Una vez así resuelto, consignamos el acuerdo adicional del Tribunal y, al amparo de la Regla 50 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A, instruimos al Secretario General que remitiera inmediatamente el mandato. También ordenamos a las partes "atenerse a lo resuelto".

No obstante los términos claros de esa resolución, nuevamente Pueblo International, Inc. *et al.* han comparecido mediante escrito titulado *Solicitud sobre devolución del mandato, reconsideración y paralización de sentencia.*

Resolvemos.

## II

Remitida a la Juez Asociada Señora Naveira de Rodón la solicitud de Pueblo International, Inc. *et al.*, de que intervenga en la decisión, ésta ratifica su inhibición.

## III

Sobre la moción de reconsideración, se deniega la misma. Los Señores Jueces que intervienen reiteran y ratifican sus respectivas posiciones en lo referente a la constitucionalidad y aplicación de la Ley de Cierre, según formulados en los votos emitidos en la Sentencia de 23 de noviembre de 1988 y en la Resolución de 20 de enero de 1989.

## IV

Finalmente, aclaramos que el acuerdo para remitir el mandato al foro de instancia fue motivado por la importancia de la adjudicación de nuestra opinión de 23 de noviembre de 1988 y con miras a finalizar esta controversia ante este Foro. No existe, pues, razón para recobrar el mandato y paralizar la ejecución de la sentencia. Por ende, se deniega la solicitud de paralizar la ejecución del mandato.

Las partes y, en especial, Pueblo International, Inc. *et al.* y su representación legal, bajo apercibimiento de sanciones económicas, deberán atenerse a lo resuelto.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Rebollo López emitió un voto particular. El Juez Asociado Señor Ortiz hace constar que, aunque reitera y ratifica su posición de que la Ley de Cierre es inconstitucional, hubiera ordenado el desglose del escrito de los demandantes apelados y le hubiera impuesto sanciones económicas a sus abogados por haber violado la Resolución de 20 de enero de 1989. La Juez Asociada Señora Naveira de Rodón se inhibió.

*(Fdo.)* Francisco R. Agrait Lladó
*Secretario General*

—O—

Voto particular emitido por el Juez Asociado Señor Rebollo López.

A manera de epílogo, la radicación de la moción de reconsideración por parte de los demandantes apelados —en violación de nuestra Resolución de 20 de enero de 1989— nos permite exponer varios pensamientos que bullen en nuestra mente.

## I

En la opinión concurrente que emitiéramos el 23 de noviembre de 1988 —sosteniendo la constitucionalidad de la Ley de Cierre de establecimientos comerciales— expresamos, entre otras cosas, que por razón de que la decisión que se emitía en el caso afectaba a *toda* la ciudadanía puertorriqueña, la misma, cualquiera que fuera, sería objeto de cruentas críticas por ciertos sectores de nuestra sociedad y de grandes alabanzas por otros. Advertimos, sin embargo, que ello no podía tener el efecto de amilanar o confundir a los integrantes de este Tribunal por cuanto esta Institución no actúa dentro de los parámetros de un concurso de popularidad y simpatía, y sí a la luz de unos principios y criterios jurídicos vigentes en nuestro ordenamiento jurídico, los cuales no pueden ni deben ser descartados si es que se quiere mantener nuestra estructura y estabilidad constitucional. Señalamos, en adición, que la función de derogar leyes que se convierten en obsoletas por el mero pasar de los años y que resultan antipáticas a una gran mayoría de nuestro Pueblo es *función exclusiva* de la Asamblea Legislativa de Puerto Rico.

En resumen, y en palabras bien sencillas, cada rama de nuestro Gobierno tiene que atenerse y descargar la función que nuestra Constitución le "asigna" a cada una de ellas. Esto es, la Rama Legislativa tiene la obligación de legislar;

el Poder Ejecutivo tiene el deber de implantar y poner en vigor dichas leyes, y a la Rama Judicial le compete resolver, ante un reclamo de inconstitucionalidad en relación con una de esas leyes, si la misma es o no constitucional. Dicha labor judicial, contrario a la de otras ramas del Gobierno, no puede ser descargada por los jueces conforme a sus preferencias y sentimientos personales; debe realizarse acorde con su condición de juristas.

Nuestro razonamiento o mensaje desafortunadamente no fue captado o entendido por algunos sectores de nuestro Pueblo. Las críticas severas no se hicieron esperar. No obstante la opinión afirmativa vertida por expertos en derecho constitucional, esos sectores de nuestra ciudadanía incluso han llegado a cuestionarse cómo es posible que algunos de los integrantes de este Tribunal hayan sido capaces de tal determinación. No hay duda de que se olvidan del hecho de que este Tribunal en el año 1982 —mediante el voto afirmativo unánime de Jueces distintos a los actuales e, incluso, antes de que la citada Ley de Cierre fuera objeto de enmiendas "liberalizadoras" en el año de 1983— igualmente sostuvieron la constitucionalidad de la referida ley. Sentencia de 30 de junio de 1982 emitida en *Grand Union Co. v. Giménez Muñoz, Srio. de Justicia.* Tampoco recuerdan el hecho de que en la única ocasión en que el Tribunal Supremo de los Estados Unidos se ha expresado sobre la constitucionalidad de un estatuto similar a nuestra Ley de Cierre, el Supremo federal sostuvo la constitucionalidad de la ley allí en controversia. *McGowan v. Maryland,* 366 U.S. 420 (1961).

## II

Por otro lado, nos inquieta la posición asumida por funcionarios de la Rama Ejecutiva de nuestro Gobierno a los efectos de que se ven obligados a poner en vigor la Ley de Cierre por razón de que existe "un mandato" de este Tribu-

nal que así lo exige. Dentro de nuestro sistema democrático de gobierno, repetimos, nuestra jurisdicción adjudicativa se circunscribe a determinar si una ley aprobada por la Asamblea Legislativa es o no constitucional. No le corresponde a este Tribunal implantar y ejecutar las leyes.

Conforme nuestro ordenamiento constitucional, la función de poner o no en vigor una ley es provincia exclusiva del Poder Ejecutivo. La solicitud de la demandante apelada Pueblo International, Inc., a los efectos de que se "suspenda" la ejecución de la Ley de Cierre por un período de seis (6) meses hasta que la Asamblea Legislativa tome acción sobre dicha ley es improcedente en derecho. Dicha solicitud no constituye remedio judicial apropiado dado el hecho de que nuestra decisión no creó un nuevo estado de derecho. Contrario a lo alegado por Pueblo International, Inc. en su moción de reconsideración, la decisión emitida simplemente ratificó decisiones anteriores de este Tribunal, confirmando así la validez del estado de derecho imperante bajo la Ley de Cierre. En consecuencia, dicha solicitud debe ser dirigida a y es de la competencia de la Rama Ejecutiva. Dicha rama de gobierno es la que puede hacer esa decisión, no este Tribunal.

## III

Por último, deseamos hacer constar nuestro disenso respecto a la decisión del Tribunal de no actuar en estos momentos respecto a la violación por parte de los demandantes apelados, y sus abogados, de los claros términos de nuestra Resolución de 20 de enero de 1989. En dicha resolución específicamente se le ordenó a la parte demandante apelada a "atenerse a lo resuelto" y se le instruyó al Secretario General del Tribunal para que procediera de inmediato a "la remisión del mandato en el caso de epígrafe". Resolución de 20 de enero de 1989, pág. 180.

La radicación de la moción de reconsideración por parte de los demandantes apelados constituye una evidente violación a dicha resolución y, en nuestra opinión, ameritaba no sólo que se hubiera ordenado, sin ulterior trámite y consideración, el desglose de dicho escrito, sino la imposición de severas sanciones económicas y disciplinarias a la parte apelada y a sus abogados.

Ello lo hemos hecho en el pasado en ocasiones en que otras partes y otros abogados han incurrido en conducta similar. No hay razón alguna para actuar en forma distinta en el presente caso.