Lynne TUCK, Plaintiff,

v.

McGRAW–HILL, INC., Defendant.

No. 74 Civ. 2914.

United States District Court,
S. D. New York.

Sept. 16, 1976.

Coles & Weiner, New York City, for plaintiff; Harold M. Weiner, New York City, of counsel.

White & Case, New York City, for defendant; Laura B. Hoguet, Allan L. Gropper, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff, Lynne Weiser Tuck, formerly a reporter ("senior writer") for defendant McGraw-Hill, Inc.'s publication, *Medical World News* ("*MWN*"), is suing defendant under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, claiming that defendant discriminated against her on the grounds of sex in the application of its "close relative rule" which prevented her transfer from the Washington, D.C. office of *MWN* to the New York City office of said publication, where her husband, Jay Nelson Tuck ("Tuck") was employed as a "national correspondent."

Plaintiff's employment with defendant ended on March 14, 1971. On April 7, 1971 plaintiff filed a complaint against defend-

ant with the New York State Division of Human Rights ("State Division"). On July 29, 1971, she filed a charge with the Equal Employment Opportunity Commission ("EEOC"). On June 18, 1973, after a four-day hearing, the Commissioner of the State Division dismissed plaintiff's charge, finding that the termination was not discriminatory on the basis of sex. On April 18, 1974, this determination was upheld by the New York State Human Rights Appeal Board. On April 15, 1974, plaintiff received a notice of right to sue from the EEOC. This action was instituted on July 8, 1974.

By order dated November 26, 1974, the Court granted summary judgment dismissing plaintiff's first claim on the ground that there was no jurisdiction in this Court under Title VII because the EEOC charge, then alleged to have been filed on March 3, 1972, had not been filed within 300 days of the last allegedly discriminatory act; dismissing plaintiff's second claim asserted under section 1981 of Title 42 of the United States Code because there was no allegation of racial discrimination; and dismissing plaintiff's third claim asserted under the First and Ninth Amendments to the Constitution since there was no allegation of discrimination by the government. Upon plaintiff's presentation of documentation that the EEOC charge was timely filed, judgment dismissing her first claim was vacated by order of this Court filed March 3, 1975.

The action was tried to the Court without a jury. At the end of the trial, defendant moved to dismiss the complaint, contending that on the facts and the law plaintiff has not shown any right to relief under Title VII. Fed.R.Civ.P. 41(b).

At trial, plaintiff testified on her own behalf, and plaintiff and defendant each called several witnesses.[1]

## THE FACTS

On the basis of plaintiff's evidence introduced at trial and the stipulations in the

---

1. Plaintiff called as witnesses: Jay Nelson Tuck, her husband; Mary E. Price, a senior writer for another of defendant's publications, *Contemporary Surgery;* Joseph J. Famularo, senior vice president of personnel for defendant; Steven Cohn, son of Howard Cohn, execu-

parties' pre-trial order, the following appears.

Defendant, now and at all times relevant to this action, publishes 40 to 50 publications, one of which is *MWN,* a weekly news magazine for doctors. The editorial and executive board of *MWN* in 1969 through 1971 consisted of Dale Bauer, publisher; Howard Cohn, executive editor; John Connors (and later Ulys Yates), managing editor; and Dorsey Woodson, Washington, D.C. bureau chief and plaintiff's immediate supervisor.

Plaintiff, who had been a writer for other magazines,[2] was first hired at *MWN* in July 1969 as a senior writer, and was assigned to the Washington, D.C. bureau. On October 25 or 26, 1970, plaintiff informed her Washington, D.C. bureau chief, Dorsey Woodson, that she desired a transfer to the New York bureau of *MWN* because she was marrying Tuck, who then was the "national correspondent" for *MWN* and was employed in the New York bureau. Tuck, who had been a journalist for 20 years prior to commencement of his employment with *MWN* in 1966, held in 1969 and 1970 the highest ranking position open for a reporter at *MWN.* Woodson called defendant's corporate headquarters in New York City and was advised that there was a company rule prohibiting the employment of "close relatives" in the same "operating unit", such as the same publication or department (the "Rule"). Specifically, the Rule provides:

### "A.—RECRUITMENT, SELECTION, AND PLACEMENT

### IX.—EMPLOYMENT OF RELATIVES

"*WHAT IS THE BASIC POLICY?* To permit and encourage the employment of relatives of employees subject to the following conditions: (1) No employee may work under the immediate supervision of a "close relative." (2) Two or more employees who are "close relatives" may not work in the same operating unit, such as a publication or departmental section.
"Who Are "Close Relatives"?

"The term "close relative" as used here includes: husband-wife; brother-sister and parent-child relationships by either blood or marriage, and blood relationships between uncles, aunts, nieces, and nephews.
"What Is the Reason for This Policy?

"The employment of close relatives in the same operating unit may lead to jealousies and misunderstandings that work to the disadvantage of both the company and the employee. This policy has been established to prevent such embarrassing situations from arising.

### "PROCEDURE ON EMPLOYMENT OF RELATIVES

"Ascertain If Relatives Are In Our Employ

"During the interview of any prospective employee, he should be asked if he or she has any close relatives currently employed by McGraw-Hill. If the answer is in the affirmative, this should be noted on the application for employment. If the applicant is hired, this information then becomes part of the employee's permanent employment record file. Obviously this is important if and when the employee is considered for promotion or transfer. Before the applicant is hired, it may be useful to check with the supervisor of his relative for information that may be pertinent to the situation.
"Transfer Close Relatives

tive editor of *MWN*; Christine Lardner, plaintiff's counsel's secretary; and Robert Bernhard, a former medical writer for *MWN,* who resigned after he married another writer with *MWN* because he wanted to write a novel.

Defendant's witnesses were: Howard Cohn, the executive editor of *MWN*; Aurora Parisi, personnel administrator for defendant's publications division; Donald Rubin, at all relevant times, assistant managing editor of MWN; and

Mrs. Lynn Lutjen, Mrs. Candy Berquist, and Mrs. Phyliss Walters, each former employees of defendant who married other employees in their "operating unit" and then left defendant's employ.

2. Plaintiff had been a writer for a total of seven years, four years with *Space Business Daily,* and three years with *Medical Tribune* and *Drug Research Reports.*

"If, while on the payroll, an employee becomes a close relative of another employee in the same publication or department section, one of the two must be transferred. (See Chapter . . . on Transfers.) If a suitable transfer cannot be arranged, one of the two employees will be required to resign. An employee who is required to resign does not qualify for separation pay."

The Rule was printed in the defendant's "Policies and Procedures Manual" (the "Manual"), which was distributed to approximately 1500 management personnel and supervisors, but was not in the edition of defendant's employee handbook, "McGraw-Hill and You," then distributed to each employee. It does not appear that either Woodson or John Connors, the managing editor of *MWN* in 1969 and 1970, had known of the Rule previously.

It appears that the purpose of the Rule was to avoid misunderstandings and potential conflicts which may arise for the two "relatives" and for other employees working with them. Joseph Famularo, vice president of personnel for defendant, stated in a letter to an inquiring employee:

"Supervisors tend to think about the reaction of both employees when faced with a difficult problem affecting only one of them. The employees themselves can be placed in awkward situations where their personal relationship inhibits taking action that might be disagreeable to the relative who is affected. Other employees wonder about favoritism between relatives, especially if one of them is in a managerial position."

Plaintiff testified that she first learned of the Rule from Woodson on October 26, 1970. Since plaintiff and her husband had decided that she would move to New York after their marriage, plaintiff sought an exception to the Rule to permit her transfer. Plaintiff signed a memorandum prepared by Woodson, dated October 26, 1970, to Managing Editor Connors stating that

plaintiff wanted to transfer to New York for "personal reasons" and that her "last day in the Washington office [would] be December 4." Woodson, Connors and Cohn thought highly of plaintiff's capabilities as a reporter and endorsed her request for a transfer. At Cohn's request, Aurora Parisi, personnel administrator for defendant's publications division, discussed the application of the Rule with her superior, Joseph Famularo. Parisi then informed Cohn that no exceptions to the Rule had ever been made, and Cohn so informed plaintiff.[3] Plaintiff then requested a leave of absence to relocate to New York and explore job opportunities with defendant there. This request was initially denied since defendant's policy did not provide for leaves of absence when an employee did not intend to return to the same job held previously. However, at the instance of Dale Bauer, the publisher of *MWN,* defendant later agreed to make an exception to the leave of absence policy for plaintiff. Bauer so informed plaintiff by letter dated December 16, 1970, in which he stated that following expiration of plaintiff's accrued vacation (which ended on December 14, 1970) the 90-day leave of absence would commence, and "[f]ollowing this period of time, at your convenience, we would like you to investigate the opportunities that exist in the entire corporation for a writing job . . . ." On December 29, 1970, plaintiff acknowledged Bauer's letter and stated that this "arrangement [was] thoroughly acceptable."

Previously, in early December 1970, plaintiff again questioned Woodson about the Rule. The same day, Woodson obtained a copy of the Manual from the defendant's main Washington, D. C. office and showed it to plaintiff. By letter to Rubin dated December 10, plaintiff stated that she "had no choice but to contest [defendant's] policy" as to her termination.

At about this time, at Cohn's suggestion, plaintiff spoke to Rubin about obtaining

---

3. It appears that plaintiff also was informed at about this time that she would be deemed to have "resigned" from the defendant's employ, and that under the Rule, she would not be entitled to severance pay.

another position on one of defendant's other publications in New York, and Rubin invited her to submit a resume for this purpose. Instead of a new resume, plaintiff authorized circulation of her original employment application to *MWN.*

Plaintiff and Tuck were married on December 12, 1970 and plaintiff moved to New York City.

When plaintiff returned from her honeymoon, she "waited for the personnel office to tell [her] about any jobs that might be suitable." Her next communication with defendant was by letter to Bauer dated March 1, 1971 asking what arrangements had been made for her commencing work in New York. Apparently independent of plaintiff's inquiry, defendant's personnel department sent plaintiff a letter inviting her to contact them about finding a position with the defendant in New York. On March 11, 1971, plaintiff met with a representative of defendant's personnel department, and as a result, interviewed for a position as a writer on a mining journal that same day. Although the evidence indicates that she was favorably received, plaintiff wrote the editor of the journal that she did not wish to pursue that opportunity because of the technical nature of the topic and the time she had invested in medical writing. Also on March 11, plaintiff met with Parisi who gave her a copy of the Rule and offered to extend plaintiff's leave of absence to enable her to find a satisfactory position in New York. Plaintiff testified that she declined because she believed that defendant already had "had ninety days to look for suitable employment" for her.[4]

On March 15, 1971, the end of plaintiff's leave of absence, she reported to work and met with Rubin and Bauer who explained that she was being "terminated."

In the Spring of 1971, a new magazine entitled *Contemporary Surgery* was being organized by defendant as a specialized publication for surgeons. The editorial board and staff of *Contemporary Surgery* were the same as that of *MWN,* and otherwise *Contemporary Surgery* had only one full-time employee. By letter to Rubin dated August 11, 1971, plaintiff inquired about a position as a writer on this new magazine. Plaintiff's application was denied, however, since, according to Parisi, the two magazines were considered by defendant to be part of the same "operating unit" for the purposes of the Rule.[5]

## DISCUSSION

There is no dispute that the wording of the Rule is not discriminatory on its face. Plaintiff contends, however, that defendant's application of the Rule to her was discriminatory on three grounds: on the basis of her sex as a woman; on the basis of her marital status or family relationship; and on the basis of her "sex–plus marriage to a fellow employee." Defendant denies that any discrimination has been shown.

Plaintiff initially contends that the doctrine enunciated in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), renders defendant's application of the Rule unlawful under Title VII. In *Griggs,* the Supreme Court held that Title VII requires the "removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification," that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation," and that defendant's "good intent or absence of discriminatory intent does not redeem employment procedures . . . that operate as 'built-in-headwinds' for minority

---

4. Plaintiff also testified that Parisi had stated that plaintiff "had to leave, period, under the Rule," and that if plaintiff "wanted to keep [her] job, [she] shouldn't have got [sic] married."

5. In addition, the evidence indicates that in February 1971, at the time the Rule was being enforced against plaintiff, defendant hired a woman to fill a vacancy for the position of senior writer at *MWN* in New York, and that in September 1971, it hired a woman as a staff senior writer for *Contemporary Surgery.*

groups and are unrelated to measuring job capability." *Id.* at 431–32, 91 S.Ct. at 854.

■ Discrimination on the basis of sex resulting from the operation of a facially neutral rule is encompassed by Title VII. *See Harper v. Trans World Airlines, Inc.,* 525 F.2d 409 (8th Cir. 1975).

In applying the *Griggs* doctrine, the Court of Appeals for the Second Circuit stated that:

"Proof in employment discrimination cases proceeds from effect to cause. Plaintiffs establish the racially [or other impermissibly] disparate consequences of defendants' employment practices, and defendants must then justify such consequences on constitutionally acceptable grounds." *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 425 (2d Cir. 1975).

This burden of proof was similarly explained by the Eighth Circuit in *Harper v. Trans World Airlines, Inc., supra.*[6] *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Jones v. New York City Human Resources Administration,* 528 F.2d 696 (2d Cir. 1976).

In plaintiff's case, she has not shown that women's employment opportunities within defendant's publications were restricted, that women or any sub-group suffered disparate treatment, or that the Rule in general operated to perpetuate prior discrimination or cause new discriminatory effects.

As to application of the Rule in general, plaintiff appears to rely heavily on testimony that in all but one case where the Rule was applied to two employees who married, it was the woman who left defendant's employ or was transferred. This evidence does not satisfy plaintiff's burden of proof: the record is unclear as to the number of cases actually involved and there was no proof that the Rule in fact perpetuated unlawful discrimination by defendant. On the contrary, the only testimony presented from women who left defendant's employ after marriage to another employee working in the same "operating unit" indicates that in each case the employees involved decided which of the two would leave or be transferred, and that defendant's personnel department encouraged the woman to continue with the company even if the couple decided it would be she that switched jobs.[7]

■ Nor has plaintiff proved that she in particular suffered discrimination by defendant based on her sex in the application of the Rule. Plaintiff notified defendant, both informally in conversation with Woodson prior to learning of the Rule and formally in writing after being informed, that she intended to move to New York after her marriage. Plaintiff apparently did not ask to read the Rule until more than a month after learning of it, but when she did inquire, she was shown it the same day. Even after reading in the Rule that "one of the two" employees must transfer or resign, plaintiff did not indicate that she and Tuck might be willing to adopt an alternate course of action besides her transfer to *MWN* or another of defendant's publications in New York. From the outset, plaintiff sought an exception to the Rule, and indeed, since that was what she wanted, her editors endorsed that request. Failure to make an exception to a facially neutral policy is not a violation of Title VII. There was no proof that exceptions previously had

6. The court stated:

"In order to successfully maintain a Title VII action, the plaintiff must initially prove that the practices of the employer have a discriminatory effect. While the employer is not necessarily vindicated merely because he lacks the intent to discriminate, . . . he will be absolved if the plaintiff fails to prove a discriminatory effect upon a protected class. If discrimination is not shown, the judicial inquiry ends. 525 F.2d at 411 (citations omitted).

7. Since there has been no showing of a discriminatory effect of the Rule, no support for plaintiff's claim can be found in the cases she cites regarding an employer's justification of challenged policies as having a "business purpose." *E.q., Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir. 1971); *United States v. Bethlehem Steel Corp.,* 446 F.2d 652 (2d Cir. 1971); *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385 (5th Cir. 1971); *Johnson v. Pike Corp.,* 332 F.Supp. 490, 495–96 (C.D.Cal.1971).

ever been made for other employees, or that a different policy would have been applied to Tuck if he had sought to transfer.

Rather than being precluded from employment with defendant as in the cases plaintiff relies upon, defendant's representatives offered a number of times to help plaintiff obtain alternative employment. Plaintiff did not pursue possible opportunities. For example, she did not contact Bauer in accordance with his offer of assistance, nor the personnel department until two weeks before her leave of absence was to expire, and she declined Parisi's offer to extend the leave of absence. Defendant, a company with approximately 12,000 employees in 1971, was not required under Title VII to take greater initiatives than it did to assist plaintiff in finding an alternative position during her leave of absence.

Plaintiff's alternative arguments that the Rule is unlawfully discriminatory on the basis of marital status or family relationships, or on the basis of her "sex–plus marriage to a fellow employee" also must fail since there has been no showing that the Rule perpetuated or caused discrimination against her or any group of employees.[8]

It appears that, at most, plaintiff established a case of misunderstanding and perhaps lack of communication in a large corporate organization. Plaintiff failed to show discrimination on an unlawful basis of a violation of Title VII. Accordingly, plaintiff's complaint is dismissed.

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

It is so ordered.

---

**8.** There is little, if any, relevant similarity between defendant's Rule and the totally exclusionary policies involved in the cases plaintiff relies upon in this regard. *See Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 90 S.Ct. 496, 27 L.Ed.2d 613 (1971); *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (7th Cir. 1971); *Diaz v. Pan American World Airways, Inc., supra; Local 53, International Association of Heat and Frost Insulators & Asbestos Workers v. Vogler,* 407 F.2d 1047 (5th Cir. 1969).