FERNANDO LUIS SOSTRE LACOT, demandante y recurrente, *v.* ECHLIN OF PUERTO RICO, INC., LUIS A. MORALES, FRANK DOMENECH e IVONNE CASTRO, demandados y recurridos.

*Número:* RE-89-679          *Resuelto:* 29 de junio de 1990

*Heriberto Rodríguez López,* abogado del recurrente; los recurridos no comparecieron.

## RESOLUCIÓN

A la anterior solicitud de revisión, no ha lugar.

Lo acordó el Tribunal y certifica el señor Secretario General Interino. El Juez Asociado Señor Negrón García emitió voto disidente, al cual se une la Juez Asociada Señora Naveira de Rodón.

(*Fdo.*) Heriberto Pérez Ruiz
*Secretario General Interino*

—O—

Voto disidente del Juez Asociado Señor Negrón García, al cual se une la Juez Asociada Señora Naveira de Rodón.

Este disenso se nutre de una premisa cardinal: la humanización del derecho le exige al jurista reconocer "la realidad de los seres humanos de carne y hueso y espíritu frente a la abstracción estéril". Informe de la Comisión de Preámbulo de la Convención Constituyente, 4 Diario de Sesiones de la Convención Constituyente 2558 (1961). A su vez, es el resultado natural de nuestro rico acervo constitucional, estatutario y jurisprudencial, en conjunción con valores tradicionalmente protegidos como el matrimonio y la familia.

I

Fernando Luis Sostre Lacot comenzó a trabajar para Echlin of Puerto Rico, Inc. (Echlin) en 19 de noviembre de 1979. Allí conoció a Judith González De León, empleada de la misma empresa, con quien contrajo matrimonio en 3 de enero de 1987. Poco más de tres (3) meses después, en 15 de abril de 1987, fue despedido de su empleo. Echlin apoyó su determinación en la norma interna que prohíbe *"emplear"* matrimonios.(1) Antes del despido, Echlin dejó a discreción de los cónyuges cuál de los dos (2) quedaría cesanteado. En ausencia de esta decisión optó por despedir a Sostre Lacot, quien gozaba de menor antigüedad en el empleo.

Por estos hechos Sostre Lacot instó acción por despido injustificado y daños y perjuicios en el Tribunal Superior, Sala de Ponce. Alegó discrimen por razón de sexo o condición social en violación de la Sec. 1 del Art. II de nuestra Constitución, L.P.R.A.,

---

(1) La Norma Núm. 10 dispone: "Las reglas de Echlin de Puerto Rico prohíben emplear familiares cercanos como madre, padre, hijos, hermanos y matrimonios." Moción de Sentencia Sumaria, Anejo B, pág. 40. Una interpretación literal nos llevaría a concluir que se trata de una norma que sólo regiría el *reclutamiento* de empleados y *no su retención.*

Tomo 1, y de la Constitución federal. Invocó, además, los Arts. 1 y 1-A de las leyes del trabajo de Puerto Rico, 29 L.P.R.A. secs. 146 y 146a y el Título VII de la Ley de Derechos Civiles federal de 1964 (42 U.S.C. sec. 2000e *et seq.*).

Echlin aceptó las principales alegaciones de la demanda. Negó, sin embargo, que los esposos Sostre-González trabajaran en plantas diferentes.[2] Sostuvo, además, que el despido por haber contraído matrimonio con una empleada de la misma empresa no constituía un acto discriminatorio por razón de condición social o sexo y que ni la Constitución ni la ley conferían tal causa de acción. Presentó moción de desestimación que inicialmente el tribunal de instancia declaró sin lugar.

Posteriormente pidió sentencia sumaria a su favor fundado en que el despido estaba justificado porque la empresa tomó en consideración la antigüedad en el empleo de los cónyuges. El ilustrado tribunal (Hon. Felipe Ortiz Ortiz, Juez) acogió la moción y desestimó sumariamente.

Inconforme con esa decisión, Sostre Lacot acudió a este Foro. En síntesis, reitera sus planteamientos y cuestiona la procedencia de la sentencia sumaria. Apuntala su solicitud de revisión en que su despido por razón de matrimonio es inconstitucional y, como cuestión novel en esta jurisdicción, amerita nuestra consideración.

La mayoría de este Foro no acogió ese reclamo y se ha negado a expedir y revocar. Disentimos.

## II

El ingreso masivo de las mujeres a la fuerza trabajadora fuera del hogar significó para los cónyuges el auge de la prohibición de trabajo en la misma empresa (*no-spouse employment policies*).[3]

---

[2] Sostre Lacot alegó que trabajaba en la planta del sector "La Guancha" de Ponce, a una distancia aproximada de entre diez (10) a doce (12) kilómetros de la planta donde trabaja su esposa en el sector "El Tuque" del mismo municipio.

[3] Esta política se considera como una variante de la política de antinepotismo en el empleo (*antinepotism employment policies*) que le impide trabajar en la misma empresa a los miembros de la familia inmediata.

En Estados Unidos esta política se ha impugnado en múltiples tribunales estatales y federales. Específicamente ha confrontado oposición en aquellas jurisdicciones con legislación expresa contra el discrimen por sexo y estado civil (*marital status*).[4] Anotación, *What Constitutes Employment Discrimination on Basis of "Marital Status" for Purposes of State Civil Rights Laws*, 44 A.L.R. 4th 1044. También se ha cuestionado con éxito a la luz de la prohibición de discrimen por sexo del Título VII de la Ley de Derechos Civiles federal de 1964, *supra*. *E.E.O.C. v. Rath Packing Co.*, 787 F.2d 318 (8vo Cir. 1986); Anotación, *Distinctions Based on Marital Status as Constituting Sex Discrimination Under Sec. 703(a) of Civil Rights Act of 1964 (42 U.S.C. secs. 2000e-2(a)*, 34 A.L.R. Fed. 648; Nota, *Employment Discrimination and Title VII of the Civil Rights Act of 1964*, 84 Harv. L. Rev. 1109 (1970–1971). Otros tratamientos bajo el mismo estatuto los encontramos en *Yuhas v. Libbey-Owens-Ford Co.*, 562 F.2d 496 (7mo Cir. 1977); *Espinoza v. Thomas*, 580 F.2d 346 (8vo Cir. 1978); *Keckeisen v. Independent School District 612*, 509 F.2d 1062 (8vo Cir. 1975); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409 (8vo Cir. 1975); *Tuck v. McGraw-Hill, Inc.*, 421 F. Supp. 39 (1976); *Southwestern Community v. Community Services, Etc.*, 462 F. Supp. 289 (1978); *Meier v. Evansville-Vanderburgh School, Corp.*, 416 F. Supp. 748 (1975).

El Título VII de la Ley de Derechos Civiles federal de 1964, *supra*, considera una práctica ilegal del patrono discriminar contra cualquier individuo por razón de su sexo (42 U.S.C. sec. 2000e-2(a)), a menos que el sexo sea una cualificación ocupacional *bona fide* razonablemente necesaria para la operación del negocio (42 U.S.C. sec. 2000e-2(e)(1)). A pesar de que el propio Título VII no considera específicamente distinciones fundadas en el estado civil

---

[4] Por lo menos veintitrés (23) estados han aprobado legislación contra el discrimen a base de *marital status*. Véanse: *Thomson v. Sanborn's Motor Express, Inc.*, 382 A.2d 53 (N.J. 1977); *Wash. Water Power v. Wash. State Human Rights*, 586 P.2d 1149 (Wash. 1978); *Kraft, Inc. v. State*, 284 N.W.2d 386 (1979); *In Manhattan Pizza Hut v. New York State, Etc.*, 415 N.E.2d 950 (1980); *Thompson v. Board of Trustees, Sch. Dist., Etc.*, 627 P.2d 1229 (Mont. 1981); *Miller v. C.A. Muer Corp.*, 362 N.W.2d 650 (1984); *Whirlpool Corp. v. Civil Rights Commission*, 390 N.W.2d 625 (1986).

(*marital status*) —*status* marital— diversas decisiones de tribu-
nales federales y de la Comisión de Igual Oportunidad en el
Empleo (*Equal Employment Opportunity Commission*
(E.E.O.C.)), así como reglamentos de la E.E.O.C., indican que
tales distinciones pueden constituir discriminación según el citado
Título VII.

Las modalidades y justificaciones de este enfoque patronal
pueden resumirse así:

> Las políticas contra el nepotismo y el empleo de los cónyuges se
> manifiestan de diversas formas. Algunas disponen que el patrono no
> puede emplear al cónyuge de un empleado; otras exigen que las
> parejas casadas no trabajen en la misma oficina, rama o departa-
> mento. *Si dos empleados de una compañía contraen matrimonio
> posteriormente, por lo regular se exige que uno de ellos renuncie al
> trabajo, lo transfieran o lo despidan.* Además, algunas políticas
> sobre empleo prohí[í]ben que un cónyuge supervise al otro o que
> recomiende su aumento de salario o su promoción. Por otra parte,
> para evitar los problemas de la competencia entre parejas de
> empleados, los patronos pueden impedir que ambos se desempeñen
> en áreas en las cuales sus carreras sigan una misma trayectoria o
> que trabajen en puestos en los que tengan un estrecho contacto.
> Otros patronos no permiten que las parejas casadas coincidan en
> posiciones en que, mediante artimañas, puedan mejorarse económi-
> camente a expensas de la empresa. Las razones de estas normas
> varían tanto como las normas mismas. Los patronos desean ofrecer
> resistencia a la presión que ejercen los empleados para que se
> coloque a sus cónyuges y evitar, al mismo tiempo, el resentimiento
> de aquéllos cuyos cónyuges no sean empleados. Asimismo, a los
> patronos les preocupa que cuando la pareja casada trabaja en una
> empresa, puede ocurrir que la conducta de un cónyuge afecte la
> disciplina del otro. De igual forma, los patronos temen que cuando
> la posición de uno le obliga a supervisar al otro, el cónyuge que
> supervisa pueda ser incapaz de disciplinar o dirigir a su cónyuge
> como lo haría otro empleado. Aún más importante es el hecho de
> que los demás empleados pueden resentir lo que consideran el
> favoritismo de un supervisor debido a su relación conyugal. Final-
> mente, el empleo de un matrimonio crea dificultades administrati-
> vas en lo que concierne a asuntos como la programación de
> vacaciones, licencias por enfermedad y otros problemas comunes.
> (Traducción nuestra, énfasis suplido y citas omitidas.) A. Giattina,
> *Challenging No-Spouse Employment Policies as Marital*

*Status Discrimination: A Balancing Approach,* 33 The Wayne L. Rev. 1095, 1113–1114 (1987).

## III

Con vista a las justificaciones de esta norma desde la perspectiva patronal, es menester esbozar varias reflexiones antes de analizar el marco jurídico que debemos utilizar para examinar su legalidad en el contexto puertorriqueño.

Reconocemos que los reglamentos o normas de trabajo son medidas indispensables que facilitan un régimen de disciplina interna y hacen viable el mejor desenvolvimiento de las relaciones obrero-patronales. Sin embargo, salvo cuando media un convenio colectivo que regule la materia, debemos también reconocer que ese régimen no deja de ser el producto de la manifestación unilateral de la voluntad del patrono. Su validez, por lo tanto, sólo podrá aducirse siempre que no sea contraria a la ley, la moral y la política pública. En nuestro país, de ordinario, no es requisito que tales reglamentos o normas sean previamente aprobados por la autoridad encargada de aplicar y vigilar el cumplimiento de las leyes laborales. Ausente ese cedazo —ante reclamos oportunos— corresponde a los tribunales evaluar cuidadosamente su legalidad.

En esa tarea, el escrutinio judicial ha de partir de la premisa de que cada día es mayor la participación del Estado en el régimen del trabajo.

En el contrato de trabajo no se trata del mero interés de las partes, sino de algo superior, si cabe, a éstas; *es decir, de la propia personalidad humana.* Mientras en cualquier otro convenio, como norma y no como excepción, la idea del individuo físico desaparece en su relación con el objeto, en este contrato se confunde la idea de la personalidad con el trabajo que viene a ser su objeto. Los factores sociales obligan, como señaló WALKER LINARES, a intervenir; *por lo cual no podrá ser regido por el principio de la libertad contractual, ni deberá dejársele sometido al libre juego de las leyes económicas.* Por esa causa, el Estado, al promover el amparo del trabajo y del trabajador, realiza la primera y más eficaz obra constructiva; y, al intervenir en las relaciones contractuales defini-

das entre trabajadores y patronos, lo hace formulando principios en los que la equidad debe señalar su predominio, alejándose de los moldes clásicos de los contratos del Derecho Civil, en donde las partes siguen concibiéndose, teóricamente al menos, como autónomas en sus determinaciones y en un idéntico pie de igualdad.

La razón por la cual interviene el Estado, para imponer imperativamente la aplicación de las cláusulas que teniendo carácter protector reducen al mínimo la autonomía de la voluntad, es que, "en realidad, el trabajo, por la universalidad de su origen, de su fin y de la repercusión que su ejercicio tiene en la especie, toca a la colectividad en su raíz más profunda". El problema ha sido enfocado con ecuanimidad por BURGOS Y MAZO al decir: "Del trabajo nacen dos intereses, dos funciones; una individual y otra social. Los antiguos legisladores no vieron más que la primera, y de aquí el punto de partida para la rectificación. El trabajo es un vínculo jurídico personal, visible, de forma contractual, que une al que trabaja y cobra por trabajar con el que paga y manda; pero al mismo tiempo un vínculo personal indivisible de figura tutelar, entre el ciudadano que trabaja y la sociedad entera; hay un interés social en el cumplimiento de todo contrato de trabajo. Y si de aquél nace una perfecta obligación individual recíproca, de éste ha de elevarse una obligación de todos para el que contrata su trabajo, de ineludible asistencia social. La ley, expresión de la voluntad colectiva, cumple ese deber, por la reglamentación del contrato de trabajo, una de las más firmes bases del progreso social. *En nombre del interés social, la voluntad de las partes contratantes del trabajo (antes única ley) es acosada por la ciencia y la moral que mandan en los dominios de la edad y del sexo, de la instrucción y de la habitación, de la salud del cuerpo y del respeto a las conciencias.*" (Énfasis suplido y citas omitidas.) G. Cabanellas, *Tratado de Derecho Laboral,* Buenos Aires, Eds. El Gráfico Impresores, 1949, T. II, págs. 133–134.

Definitivamente, los días del *laissez faire* pertenecen a tiempos pretéritos. Los tribunales, pues, no pueden asumir una actitud de indiferencia o pasividad ante los conflictos laborales. Sin duda alguna, la vieja idea de la libertad de contratación recogida en nuestro ordenamiento civil fue claramente superada. Hoy la legislación laboral es preeminentemente social y protectora, y pretende subsanar la diferencia de situación entre aquel que presta sus servicios y el que los recibe. En nuestro país, esa

legislación constituye reivindicaciones sociales irreversibles, producto de enconadas luchas a lo largo de décadas. Por esta razón los tribunales intervienen, no ya en interés de los contratantes sino en el de la sociedad entera en defensa de los derechos fundamentales o importantes como lo son, por ejemplo, el trabajo, el matrimonio, la intimidad y dignidad del ser humano y la familia.

Así "[e]l tema es más profundo de lo que a simple vista podrá parecer. En el fondo de la cuestión late un conflicto de intereses, incluso de clases sociales. El trabajador contrata con el empresario para subsistir; el empresario con el trabajador para obtener beneficios económicos. Y es para proteger esos intereses económicos para lo que ciertos contratos de trabajo incluyen esa cláusula de restringir el ejercicio de un derecho tan fundamental como pueda ser el de contraer matrimonio con la persona que libremente elija". L.M. Fariñas Matoni, *El Derecho a la Intimidad,* Madrid, Ed. Trivium, 1983, pág. 133.

## IV

El derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas. El destino incierto de la frustrada Sec. 20 de nuestra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado. Véanse: Constitución de Estados Unidos de América, Emda. Art. IX; Constitución del Estado Libre Asociado, Art. II, Sec. 19; *Ortiz Cruz v. Junta Hípica,* 101 D.P.R. 791, 794–795 (1973). 4 Diario de Sesiones, *supra,* págs. 2530–2532, 2539–2543, 2575–2577. En efecto, la Convención Constituyente tuvo muy presente expandir el alcance del concepto "vida" como derecho inalienable del hombre. *Amy v. Adm. Deporte Hípico,* 116 D.P.R. 414, 421 (1985).

En los últimos años el derecho al trabajo se ha afianzado como un derecho de alta jerarquía. *Pueblo Int'l, Inc. v. Srio. de Justicia,* 123 D.P.R. 179 (1989), opinión concurrente; *Hernández Cruz v. Sria. de Instrucción,* 117 D.P.R. 606, 615 (1986); *Arroyo v. Rattan Specialties, Inc.,* 117 D.P.R. 35 (1986).

Estas disposiciones constitucionales no pueden verse aislada-
mente, pues se insertan en una corriente que durante las últimas
décadas de este siglo también generó abundante legislación social
protectora del trabajo.(5)

De esa legislación es necesario destacar la Ley Núm. 100 de
30 de junio de 1959, según enmendada, 29 L.P.R.A. sec. 146, que
prohíbe el despido por razón de edad, sexo, color, raza, origen o
condición social, ideas políticas, ideas religiosas y origen nacional;
la Ley Núm. 50 de 20 de abril de 1949, antecesora de la Ley Núm.

---

(5) "Para remediar lo expresado [(discrimen en el empleo y trabajo bajo condiciones
de alto porcentaje de accidentes)] se aprobó legislación encaminada a proteger la
seguridad de los trabajadores en el lugar de empleo y se creó en 1935 el Fondo del Seguro
del Estado, organismo gubernamental que tenía y sigue teniendo el propósito de brindar
tratamiento médico y compensación económica a los obreros que son víctimas de un
accidente ocupacional. De igual forma tuvo la ley el propósito de garantizarle una reserva
de empleo durante un término razonable a los obreros accidentados ocupacionalmente si
como resultado de dicho accidente se ven forzados a ausentarse del trabajo.

"La situación de discrimen en el empleo resultaba embarazosa a principios de siglo y
durante las primeras cuatro décadas del mismo. El discrimen por razón de ideas políticas
resultaba, quizás, el de mayor importancia toda vez que permitía al patrono exigir de los
obreros como condición de empleo el favorecer, en la forma que estimara prudente el
propio patrono, a determinados candidatos o agrupación política que a su vez estaban
plenamente ligados al interés patronal. El discrimen contra la mujer, la cual se encontraba
marginada socialmente, era otro tipo de discrimen ampliamente generalizado. La aproba-
ción de la Constitución de Puerto Rico en 1952 estableció una prohibición contra el
discrimen por razón de edad, raza, color, sexo, ideas políticas y religiosas, condición social
y origen nacional. Si bien existían desde antes de la aprobación de la Constitución
disposiciones federales, incluso constitucionales, que prohibían el discrimen por las razones
expresadas no fue hasta entrada la década de los años cincuenta que las disposiciones
federales contra el discrimen comenzaron realmente a ponerse en vigor en Puerto Rico.
Esto ocurrió al mismo tiempo que se aprobaba y ponía en vigor la legislación estatal con
disposiciones similares a las federales.

"Legislación fue aprobada para regular el empleo de menores de forma que se evite
el desempeño de éstos en circunstancias o labores que resulten lesivas a su desarrollo
integral y moral. Se protegen mediante legislación las madres obreras, a las que se les
garantiza un descanso compensado, lo que les permite atender adecuadamente las
necesidades que surgen durante el período de alumbramiento. Las uniones obreras han
sido reconocidas legalmente y disponen de organismos objetivos que atienden en la
creación, funcionamiento y problemática de las mismas." A. Acevedo Colom, *Legislación
Protectora del Trabajo Comentada*, San Juan, 1988, págs. 9–10.

Véanse: R.N. Delgado Zayas, *Apuntes para el estudio de la legislación protectora del
trabajo en el derecho laboral puertorriqueño*, San Juan, 1989; H. Wells, *La modernización
de Puerto Rico*, 1ra ed. en español, Río Piedras, Ed. Universitaria, 1972, pág. 144; V. Géigel
Polanco, *Bases, naturaleza y caracteres de la legislación social*, VII Rev. Der. Leg. Jur. C.
Abo. P.R. 84 (1944). Para entender el contexto histórico en el cual surge gran parte de esta
legislación, véanse, además: B. Silvestrini, *Los trabajadores puertorriqueños y el Partido
Socialista (1932–1940)*, Río Piedras, Eds. Universitaria, 1979; G. García, *Desafío y
Solidaridad*, 2da ed., Río Piedras, Eds. Huracán, 1986.

80 de 30 de mayo de 1976 (29 L.P.R.A. secs. 185a—185m), que exige justa causa para el despido, y la Ley Núm. 69 de 6 de julio de 1985 que visualiza, entre otras cosas, que "cualquier regla o reglamento interno de un patrono que prohíba o limite el empleo de mujeres casadas y que no sea aplicable a hombres casados, *o que prohíba el empleo de matrimonios* pero que resulta tener efectos onerosos en el caso de las mujeres, constituye un discrimen por razón de sexo". (Énfasis suplido.) R.N. Delgado Zayas, *Apuntes para el estudio de la legislación protectora del trabajo en el derecho laboral puertorriqueño,* San Juan, 1989, pág. 152.

Jurisprudencialmente hemos protegido la tenencia del empleo cuando el despido tiene el propósito o efecto de frustrar o subvertir una clara política pública (*Arroyo v. Rattan Specialties, Inc.,* supra) y, también, cuando se funda en la violación de una norma de trabajo irrazonable. *Rivera Águila v. K-Mart de P.R.,* 123 D.P.R. 599 (1989); *Srio. del Trabajo v. I.T.T.,* 108 D.P.R. 536, 542 (1979).

## V

Parecería innecesario esgrimir argumentos en defensa del valor social del *matrimonio.* Basta apuntar que como institución civil claramente establecida y protegida por el orden social y jurídico ocupa un lugar predominante en la sociedad contemporánea que sobrepasa los límites de lo controvertible. Véanse: Art. 68 de nuestro Código Civil, 31 L.P.R.A. sec. 221; *Pueblo v. Tribunal Superior,* 99 D.P.R. 30, 36 (1970); E. Vázquez Bote, *Notas sobre el matrimonio en el Derecho puertorriqueño,* 54–55 Rev. Der. Pur. 491 (1974–1975).

"[P]or ser instintivamente necesari[a], biológicamente presionante y socialmente imprescindible, la humanidad ha contemplado esas uniones . . . con el respeto debido a un acto imprescindible para su propia subsistencia, como el fuego y la alimentación lo son para la supervivencia individual." C.M. Estena Klett, *Matrimonio, separación y divorcio en la legislación actual y en la historia,* 2da ed., Pamplona, Ed. Aranzadi, 1984, págs. 15–16.

En el orden axiológico natural, pocas cosas, como el nombre y la nacionalidad, disfrutan del respeto y de las consideraciones asignadas a la institución matrimonial, tan irrenunciable e incuestionable como los más eminentes alcances de nuestra sociedad. Es por ello que no se negocia ese valor ni se reniega del alcance de ese estado, pues hacerlo equivaldría a socavar el fundamento mismo de nuestro orden civil. Atentar contra él niega el derecho al disfrute de una condición que cuenta con el favor y el amparo tanto de nuestra Constitución como de nuestra jurisprudencia.

En resumen, seguimos valorando la familia matrimonial como el régimen socialmente más deseable. Además, en nuestro país existe una clara política pública de protección y fortalecimiento de la familia, y el matrimonio es el paso inicial para su formación. *Almodóvar v. Méndez Román*, 125 D.P.R. 218 (1990). También nuestro ordenamiento jurídico resalta las virtudes de la relación matrimonial y desalienta las relaciones consensuales al margen de esta institución.

Frente a este trasfondo conceptual y jurídico, una regla *absoluta*, como la esgrimida por Echlin para justificar el despido de Sostre Lacot, de su faz actúa como una especie de cláusula resolutoria del trabajo por razón de matrimonio con compañero(a) de trabajo o como una cláusula de celibato intraempresarial. Prohíbe el ejercicio —bajo pena de despido— de un derecho que constituye el fundamento mismo de nuestro orden social, es decir, el derecho a casarse. Definitivamente, esta regla tiene un efecto disuasivo (*chilling effect*) sobre el matrimonio. *Hughes v. Lipscher*, 720 F. Supp. 454 (D. N.J. 1989). Y, contrario a otras disposiciones que se consideran al aceptar un trabajo —sobre las cuales la voluntad del individuo puede operar— nadie puede renegar de antemano del derecho a contraer matrimonio con un compañero(a) de labores. Porque el amor corresponde a esa parte de la conducta humana no volitiva, es sentimiento que surge, se impone, y no se puede impedir ni precaver, o sencillamente, recordando una frase del novelista brasileño Jorge Amado, "el amor sucede".

En virtud de lo expuesto, el alto desempleo y los crecientes desajustes económicos que sufre nuestro país, es mínima la facultad de elección del empleado. Una norma como ésta lo coloca en el siguiente trilema: casarse con quien desee hacerlo y perder el empleo; no casarse con quien desee hacerlo y retener el empleo, o convivir extramaritalmente con quien desea casarse para mantener el empleo, en clara burla de la regla.

En conclusión, el matrimonio es uno de los asuntos más personales e íntimos. Por ende, no debe estar sujeto a coerciones o intervenciones indebidas a menos que medie un interés de gran preeminencia que así lo justifique. Aunque fue dirigido originalmente al Estado, el siguiente pronunciamiento es extensible a las personas particulares:

> En la sociedad democrática organizada alrededor de los derechos fundamentales del hombre, el Estado ha de reducir a un mínimo su intervención con sensitivas urdimbres emocionales como lo son las relaciones de familia. La intromisión en la vida privada sólo ha de tolerarse cuando así lo requieran factores superantes de salud y seguridad públicas o el derecho a la vida y a la felicidad del ser humano afectado. *García Santiago v. Acosta*, 104 D.P.R. 321, 324 (1975).

## VI

Incontables páginas se han escrito en un intento de darle contenido al derecho a la intimidad.[6] Aunque se han ensayado

---

[6]  A manera de muestra representativa, véanse: L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 1302–1435; J. Rubenfeld, *The Right of Privacy*, 102 Harv. L. Rev. 737 (1989); R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1022–1077; J.J. Álvarez González, *La protección de los derechos humanos en Puerto Rico*, LVII Rev. Jur. U.P.R. 133, 171–174 (1988); L.Ma. Fariñas Matoni, *El Derecho a la Intimidad*, Madrid, Ed. Trivium, 1983; M. Zavala de González, *Derecho a la Intimidad*, Buenos Aires, Ed. Abeledo-Perrot, 1982; Raymond Wacks, *The Protection of Privacy*, London, Sweet & Maxwell, 1980; M.A. Ramírez Lavandero, *A Comparative Examination of the Right of Privacy in Puerto Rico*, LI Rev. Jur. U.P.R. 403 (1982); A.M. Romero Coloma, *Derecho a la intimidad, a la información y proceso penal*, Madrid, Ed. Colex, 1987; 2 *Treatise on Constitutional Law: Substance and Procedure 554–608 (1986)*.

múltiples definiciones del concepto,(7) todavía no existe consenso de sus contornos y alcance. De ahí que se haya expresado que el

---

(7) "Para Carbonnier, la intimidad es 'el derecho del individuo de tener una esfera secreta de vida, de la que tenga el poder de alejar a los demás'. De Cupis lo define como 'la necesidad consistente en la exigencia de aislamiento moral, de no comunicación externa, de cuanto concierne a la persona individual', o 'el modo de ser de la persona que consiste en la exclusión del conocimiento por parte de otros de cuanto hace referencia a la persona misma'. William Swindler lo definió como 'el derecho de vivir la propia vida en soledad, sin estar sometido a una publicidad que no se ha provocado ni deseado, el derecho a ser dejado solo'. Esta definición se corresponde con la realizada en 1873 por el juez Cooley. Nerson dijo que el derecho a la intimidad consiste en tener un sector personal reservado, a fin de hacer inaccesible al público, sin la voluntad del interesado, lo que constituye lo esencial de su personalidad. Lucien Martin decía que la vida privada es la vida familiar, personal del hombre, su vida interior, espiritual, la que lleva cuando vive detrás de su puerta cerrada. Prosser propone reconducir al concepto de intimidad un conjunto de ilícitos contra bienes e intereses de heterogénea naturaleza: la propiedad inmaterial (industrial e intelectual), el honor, el derecho a la tranquilidad psíquica. En 1969, G. Marty declaraba que no existe un derecho general a la vida privada, siendo ésta de difícil definición, un haz de derechos, de reglas, que coinciden en proteger la vida privada en su intimidad, estando en desarrollo la lista de tales derechos. Volviendo al panorama de nuestro Derecho, el profesor De Castro considera que los derechos de la personalidad, entre ellos el de la intimidad, son valores del hombre como persona, ya que se trata de bienes no materiales a los que se refieren constantemente la práctica y la doctrina a la hora de fundamentar la indemnizabilidad del daño moral. Circunscribe su tesis a una posible lesión de estos valores del hombre como persona en el ámbito del daño moral. Para Iglesias Cubria, lo íntimo es lo reservado de cada persona, lo que lícitamente se puede sustraer al conocimiento de otros, variando, según sus tesis, los límites entre el interés público y la vida íntima, según las circunstancias de lugar y tiempo. Batlle Sales, en 1972, lo definía como el derecho que compete a toda persona a tener una esfera reservada en la cual desenvolver su vida sin que la indiscreción ajena tenga acceso a ella.

"Bajo Fernández la explica como 'ese ámbito personal donde cada uno, preservado del mundo exterior, encuentra las posibilidades de desarrollo y fomento de su personalidad. Se trata, pues, de un ámbito personal reservado a la curiosidad pública, absolutamente necesario para el desarrollo humano y donde enraíza la personalidad'. Albaladejo estima que 'es el poder concedido a la persona sobre el conjunto de actividades que forman su círculo íntimo, poder que le permite excluir a los extraños de entrometerse en él y de darle una publicidad que no desee el interesado'. García Amigo considera que es un derecho subjetivo y Beltrán de Heredia y Castaño, al intentar definir los derechos de la personalidad, los conceptúan como 'aquellos derechos que atribuyen el goce de las facultades corporales y espirituales que son atributos esenciales de la naturaleza humana, condición fundamental de su existencia y actividad o, simplemente, el goce de nosotros mismos y de los que con nosotros están unidos indisolublemente; algo así como el derecho de la persona a ser fin en sí misma y a afirmarse y desarrollarse como tal, o que consiste en el señorío sobre la propia esfera de la personalidad'. Es éste un concepto que abarca a la totalidad de los derechos de la personalidad y que atiende fundamentalmente al poder o facultad del sujeto sobre ellos. Lo 'privado' es lo particular y personal de cada persona. La intimidad es la parte reservada o más particular de los pensamientos, afectos, asuntos interiores de una persona, familia o colectividad. La reserva es la precaución o cautela para no descubrir algo que se siente o piensa. Así, entiende Aurora García Vitoria que todo lo 'privado' es el reducto personal más alejado y recóndito del individuo, y al que nadie [tiene] acceso generalmente, es 'íntimo' (es decir, privativo o concerniente a él sólo), pero no siempre pues cabe la posibilidad de que participen otras personas elegidas, entrañando su admisión el que 'ese algo del sujeto' ya no sea privado, pero sí íntimo. Así pues, lo privado es particular,

derecho a la intimidad es como la obscenidad: los jueces no son capaces de definirla, pero sí de reconocerla cuando se presenta la situación.[8] Ciertamente, es un concepto genérico, escurridizo y difícil de aprehender. Su naturaleza, muchas veces abstracta, unido al hecho de su reciente reconocimiento pleno, ha representado dificultades tanto al momento de reclamarlo como en la propia adjudicación de las controversias. Así, por ejemplo, en España se ha dicho que la normativa sobre el derecho a la intimidad es "fragmentaria, anticuada e incompleta";[9] en Estados Unidos, que "en el corazón del derecho a la intimidad, ha habido siempre un vacío conceptual,[10] y en Puerto Rico se nos ha señalado que "[n]o hay, de parte del Tribunal [Supremo], ni siquiera un esfuerzo por hallar una teoría unificadora sobre este derecho y su aplicación a las más diversas circunstancias".[11]

Estas apreciaciones nos llevan a concluir que el derecho a la intimidad no puede ser una categoría cerrada, sino lo suficientemente dilatada para que pueda ser "invocable ante cualquier nuevo e inesperado desarrollo de la técnica o las costumbres".[12] Como expresara el prócer Román Baldorioty de Castro, es un derecho "ilegislable" que los tribunales de justicia deben hacer respetar. *Pueblo v. Torres Albertorio*, 115 D.P.R. 128, 136 (1984).

En lo que respecta a Puerto Rico, nuestra Constitución consagra la intimidad como un derecho fundamental: "[l]a dignidad del ser humano es inviolable" (Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1), y "[t]oda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y *a su vida privada o familiar*" (énfasis suplido) Const. E.L.A., *supra*, sec. 8).

---

individual; lo íntimo puede, en cambio, ser reducido, pero no necesariamente excluyente. Por tanto, es el número de sujetos implicados, uno de los factores que otorga el carácter de privado o íntimo a algo." (Citas omitidas). Romero Coloma, op. cit., págs. 27–29.

[8] Véase *Jakobellis v. Ohio*, 378 U.S. 184, 197 (1964), opinión concurrente del Juez Asociado Señor Stewart, citado por J. Rubenfeld, *supra*, pág. 751.

[9] Romero Coloma, *op. cit.*, pág. 49.

[10] Rubenfeld, *supra*, pág. 739.

[11] Álvarez González, *supra*, pág. 173.

[12] Fariñas Matoni, *op. cit.*, pág. 4.

El carácter y primacía del derecho y protección a lo privado nos ha movido a reconocer que opera *ex proprio vigore* y puede hacerse valer entre personas privadas. *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250 (1978); *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436 (1975); *Alberio Quiñones* v. *E.L.A.*, 90 D.P.R. 812 (1964); *González* v. *Ramírez Cuerda*, 88 D.P.R. 125 (1963). [Reiteradamente hemos señalado] que el derecho a la intimidad en nuestro país tiene un historial distinto y más amplio que el plasmado en la jurisdicción federal y exime del requisito de acción estatal (*state action*) para hacerlo valer entre personas particulares.

Este derecho constitucional impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos. *Colón v. Romero Barceló*, 112 D.P.R. 573, 576 (1982). Véanse, además: *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987), opinión concurrente de la Juez Asociada Señora Naveira de Rodón; *Arroyo v. Rattan Specialties, Inc.*, supra; *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 335 (1983).

Sobre el particular, los delegados de la Constitución expresaron:

> La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta constitución. Se trata de la inviolabilidad personal en su forma más completa y amplia. El honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra ingerencias abusivas de las autoridades. La fórmula propuesta en la sección 8 cubre ambos aspectos. Complementa constitucionalmente lo dispuesto en la sección 10 y cubre el campo conocido en el derecho norteamericano como el "right of privacy" particularmente importante en el mundo moderno. 4 Diario de Sesiones de la Convención Constituyente 2566 (1961).

Este caso nos permite continuar la tarea de elaborar los contornos mínimos del derecho a la intimidad en su modalidad de autonomía en la toma de decisiones importantes sobre la vida íntima o familiar sin la intervención del Estado o de personas particulares. Como expresión de la protección jurídica de la

persona, esta modalidad se ha esgrimido en múltiples instancias de ataques y amenazas a la intimidad en asuntos como el aborto, el matrimonio, el divorcio, las preferencias sexuales, la procreación, las relaciones familiares y el uso de contraceptivos. *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980); *Figueroa Ferrer v. E.L.A.*, supra; *Thornburgh v. Am. College of Obstetricians and Gynecologists*, 90 L.Ed.2d 779 (1986); *Carey v. Population Services International*, 431 U.S. 678 (1977); *Roe v. Wade*, 410 U.S. 113 (1973); *Whalen v. Roe*, 429 U.S. 589 (1977); *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Skinner v. Oklahoma*, 316 U.S. 535 (1942); *Paul v. Davis*, 424 U.S. 693 (1976); L. Henkin, *Privacy and Autonomy*, 74 Colum. L. Rev. 1410 (1974); Comentario, *A Taxonomy of Privacy: Repose, Sanctuary, and Intimate Decision*, 64 Calif. L. Rev. 1447 (1976); J. Feinberg, *Autonomy, Sovereignty, and Privacy: Moral Ideals in the Constitution?*, 58 Notre Dame L. Rev. 445 (1983). Véase, además, *Bowers v. Hardwick*, 92 L.Ed.2d 140 (1986).

En *Figueroa Ferrer v. E.L.A.*, supra, tuvimos la oportunidad de examinar el derecho a la intimidad y dignidad del ser humano en relación con la institución del divorcio. *Sin embargo, allí también reconocimos que el derecho a contraer matrimonio libremente emana del derecho a la intimidad.* Es por esta razón que no puede estar supeditado a factores externos que impidan sustancialmente su ejercicio libre y pleno. Y en *Loving v. Virginia*, 388 U.S. 1 (1967), el más alto Foro federal expuso que el "derecho a contraer matrimonio ha sido reconocido desde mucho tiempo como uno de los derechos vitales, esenciales para la consecución ordenada de la felicidad por los hombres libres". (Traducción nuestra.) Véanse, además: *Zablocki v. Redhail*, 434 U.S. 374 (1978); *Carey v. Population Services International*, supra; *Boddie v. Connecticut*, 401 U.S. 371 (1971); *Griswold v. Connecticut*, supra; *Skinner v. Oklahoma*, supra; *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Maynard v. Hill*, 125 U.S. 190 (1888).

## VII

Se ha sugerido que la protección del derecho a la intimidad en el contexto de las personas particulares debe ser de menor extensión que la protección otorgada a los individuos frente al Gobierno. Álvarez González, *supra*, pág. 172.

Esa visión nos conduce inexorablemente al ámbito de los criterios de análisis utilizados en la adjudicación de las controversias constitucionales. Como es lógico suponer, aunque los criterios de análisis adoptados de la jurisprudencia estadounidense han sido de gran utilidad en múltiples instancias, cuando se trata de un derecho invocable entre personas particulares —como sucede con el derecho a la intimidad— no podemos copiar mecánicamente la fórmula del escrutinio estricto. Construida expresamente para evaluar la constitucionalidad de actuaciones del Estado, su incorporación en controversias como la presente significaría exigirle un interés *público* apremiante a una persona particular. En otras palabras, equivaldría a exigirle lo imposible.

Para guiar este debate podríamos recurrir a las interrogantes que sobre este particular ha planteado el Prof. Raúl Serrano Geyls: ¿Pueden los intereses del patrono ser también intereses apremiantes del Estado? ¿Deben ser los intereses apremiantes de un patrono equivalentes a los intereses apremiantes del Estado? Serrano Geyls, *op. cit.*, pág. 1068.

La primera pregunta nos remite a un hecho de irrefutable certeza, a saber, que en determinadas circunstancias una persona particular, como es el patrono, podría evidenciar un interés apremiante que trascienda la estricta esfera de su ámbito privado. Así ocurriría, por ejemplo, en los casos que atañen a las áreas de salud y seguridad. En esas instancias u otras análogas, en que el interés público se encuentra profundamente comprometido, es ineludible la oportuna previsión del Estado. El Estado tiene, asimismo, interés en que las empresas económicas funcionen adecuada y efectivamente, y por ende puede incorporar intereses que, aunque de primera instancia parezcan corresponder al orden privado, lindan claramente con la política pública y tocan íntimamente áreas o asuntos relativos al desarrollo económico del país.

Respecto a la segunda pregunta, debe contestarse en la negativa, esto es, no procede una equivalencia entre los intereses privados y los del Estado. Pero es necesario cualificar ese "no" a los fines de enfrentarlo a las consideraciones hechas al margen de la primera pregunta.

Ante la penumbra existente, la solución más adecuada es abstenernos de elaborar reglas rígidas aplicables a todas las posibles situaciones en las que se invoque el derecho a la intimidad entre personas particulares. Se impone un enfoque judicial que permita ir construyendo sobre la marcha las normas jurisprudenciales que rijan asuntos similares al planteado. En armonía con el criterio de autolimitación, no debemos formular una regla de derecho constitucional más amplia que la que requieren los hechos precisos a los cuales ha de aplicarse. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

Desde esta óptica y desde el trasfondo doctrinario expuesto derivamos una normativa inmediata para regir la solución de controversias como la de autos. Primero, las reglas unilaterales y las cláusulas de los contratos de trabajo que *de manera absoluta* estipulan la terminación de una relación laboral por causa de matrimonio no tienen cabida en nuestro ordenamiento constitucional. Aunque desde el punto de vista estatutario el patrono tiene que probar la razonabilidad de la norma,(13) desde la dimensión constitucional es necesario ser más exigente a fin de no devaluar el derecho a la intimidad.

De acuerdo con esta perspectiva la norma que aflora es clara: el patrono tiene que demostrar la existencia de un interés apremiante como los exigidos al Estado o, en la alternativa, demostrar que el matrimonio entre dos (2) de sus empleados tendrá un efecto negativo para la empresa de naturaleza tan grave que le resultaría intolerable. Este último aspecto ameritará un análisis integral de una multiplicidad de factores que, sin ánimo de ser exhaustivos, podemos señalar los siguientes: (1) tipo o natura-

---

(13) Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185b(c)); *Rivera Águila v. K-Mart de P.R.*, 123 D.P.R. 599 (1989); *Srio. del Trabajo v. I.T.T.*, 108 D.P.R. 536, 542 (1979).

leza de la empresa; (2) tamaño y número de empleados; (3) esquema organizacional, jerarquía y líneas de mando; (4) necesidades específicas de la empresa; (5) relación laboral entre los cónyuges; (6) problemas o dificultades específicas que suscitaría el matrimonio, etc. Debe probar, además, la inexistencia de una medida menos onerosa o drástica que el despido.

## VIII

Este cuadro doctrinario nos convence de que incidió el reputado tribunal de instancia al desestimar sumariamente. Está firmemente asentado el principio de que una sentencia sumaria sólo podrá concederse cuando el tribunal tenga ante sí la verdad de todos los hechos esenciales. *Rodríguez Meléndez v. Sup. Amigo, Inc.*, 126 D.P.R. 132 (1990); *Nassar Rizek v. Hernández*, 123 D.P.R. 360 (1989); *McCrillis v. Aut. Navieras de P.R.*, 123 D.P.R. 113 (1989); *M.J.C.A., menor v. J.L.E.M., menor*, 124 D.P.R. 910 (1989); *Tello Rivera v. Eastern Airlines*, 119 D.P.R. 83 (1987).

Es improcedente si de las propias alegaciones, deposiciones, admisiones o declaraciones juradas surge una controversia *bona fide* de hechos. Cualquier duda debe resolverse en contra de la parte que la solicita. *Rodríguez Meléndez v. Sup. Amigo, Inc.*, supra; *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986); *Valcourt Questell v. Tribunal Superior*, 89 D.P.R. 827 (1964); *Roth v. Lugo*, 87 D.P.R. 386 (1963). Además, hemos señalado que los tribunales no deben resolver sumariamente aquellos casos que revistan cuestiones de interés público. *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra.

Huelga abundar sobre este particular, pues nadie puede negar el interés público de una controversia donde están en juego los derechos a la intimidad, al trabajo y al matrimonio.